## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| AETNA HEALTH INC., et al., | |
| *Plaintiffs*, | |
| v. | CASE NO.: 3:24-CV-01343-BJD-LLL |
| RADIOLOGY PARTNERS, INC., et al., | |
| *Defendants*. | |

## DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF LAW

The lawsuit filed by Aetna Health Inc., Aetna Life Insurance Company, and Aetna Health Insurance Company (collectively "Aetna"), has overlapping allegations covering a period when the parties were contracted (the "Contracted Period"), and a later period when the parties became subject to the No Surprises Act ("NSA"), 42 U.S.C. §§ 300gg-111-12 (the "NSA Period"). The Contracted Period belongs in arbitration pursuant to the contract ("Contract") between Aetna and Mori, Bean, and Brooks, Inc. ("MBB"). Defendants Radiology Partners, Inc. ("RP") and MBB have a concurrently pending Motion to Compel Arbitration ("MTC"), which Defendants respectfully suggest the Court read first. This Motion to Dismiss ("MTD") addresses Aetna's claims during the NSA Period, under Rule 12(b)(6).

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

Aetna engineered this dispute for two reasons: first, to pressure MBB and RP to accept below-market rates for its services, and second, to get out of paying its

bills—adjudicated debts under the NSA, a program administered by a co-equal branch of the federal government.

Aetna tried this before. The same tort theories were rejected categorically in a Texas arbitration against RP and another RP-affiliated medical group. Aetna's lawsuit recycles those losing theories here and tries to use them to punish MBB for winning fair reimbursement through the NSA. Aetna's ambitious goal is to avoid paying many thousands of independent NSA arbitration awards and deny MBB from future access to the NSA remedies.

The why of Aetna's strategy is revealed when the Court learns the context. Aetna repeatedly fails as a party before the NSA's Independent Dispute Resolution Entities ("IDREs"), which adjudicate out-of-network disputes: Aetna lost 98% of the time. This lawsuit is part of Aetna's long game to beat the system, while still booking record profits, cheating self-funded plans by making unduly low payments to out-of-network providers, then pushing all its NSA losses to those same self-funded customers after pocketing the phantom shared savings, all while denying patients and hospitals with access to scheduled radiology services.

Aetna prioritizes profits over patient care. Breaking its word, reneging on deals, unilaterally terminating agreements, underpaying, slow paying, frivolously

denying claims and litigation, are all recurring tools in Aetna's kit.[1] This model harms patients and providers. Patients, their families, and hospitals are improperly denied approval for necessary care; suffer longer wait times than needed; and cannot use their chosen doctors. Meanwhile, Aetna ignores the impact of the NSA fees and extra payments, because those expenses are borne by employers, even as Aetna pockets alleged shared savings from them based on the difference between the list prices and Aetna's initial low "Qualified Payment Amount" ("QPA"); not the later NSA IDRE awards correcting its underpayments. Since someone else foots the bill, Aetna keeps the unearned savings, cheating everyone. All of this represents a shameful waste of healthcare resources. Unfortunately, Aetna is singularly motivated by the profit expectations of its parent company.

In mid-2020, Aetna asked for and received from MBB a 25%-voluntary rate reduction on various radiology services, during the depths of the COVID-19 pandemic. MBB agreed to this in exchange for Aetna's promise to renegotiate a new contract once the healthcare industry recovered from the pandemic, and patients returned to care. Aetna had a very profitable pandemic, because many patients elected not to seek care. But after the pandemic, Aetna broke its promise and instead of renegotiating terminated the Contract in July 2022, forcing MBB out of network.

---

[1] *See, e.g.*, Fineman, Jay, "Delay, Deny, Defend Why Insurance Companies Don't Pay Claims and What You Can Do About It," https://www.delaydenydefend.com/ (exposing unjust practices of health insurance companies, caused by an increasing systematic focus on maximizing profits).

Next, Aetna systematically paid MBB far less than the former Contract rates as an out-of-network provider, slow paid, or did not pay, forcing MBB to submit thousands of claims for reimbursement in the NSA's Informal Dispute Resolution ("IDR") process, which MBB was required to do thousands of times. The NSA is cumbersome and expensive for providers. Many cannot afford to participate or wait months for reimbursement if they do. However, two unexpected things happened: first, MBB had access to sufficient financial resources, and with RP's support, navigated the IDR process; second, it won the NSA disputes—nearly every time. Aetna asks this Court to (1) undo the results of a process that they unilaterally forced MBB to participate in; and (2) apply a prior restraint on IDR submissions.

Aetna is mindful of its filing reaching audiences beyond the Court. The Complaint is designed for maximum impact on media and business. Its media strategy is to send a message to other providers: bow down or be sued. Its business strategy is to force disfavored providers to spend millions fighting its lawfare to defend their businesses and brands, with the object lesson: win or lose each case, scorched earth litigation is Aetna's long game.

Aetna's allegations involving the NSA Period fail because, *inter alia*:

- The NSA provides that CMS establishes and supervises IDR arbitrations. There is no NSA provision for courts to enjoin a party from submitting claims in the IDR process. Aetna cannot get prior restraint.

- Aetna failed to exhaust its administrative remedies under the NSA.

- Aetna cannot state a fraud count for the NSA Period because the pleadings confirm the purported wrong was discoverable through due diligence: Aetna alleges it terminated based on suspicions about MBB and RP. Plus, judicial notice confirms Aetna knew what it alleges here long prior, as far back as late 2021-early 2022.

- Aetna also lacks sufficient particularity to support fraud. Florida law confirms the medical group holding the hospital staffing department contract is the group that bills for the services, not other groups. Aetna did not allege that MBB lacked the staffing contracts or that the other groups held them.

- Aetna's allegations of interference and conspiracy cannot survive Aetna's allegations that RP owns, controls and has a financial interest in MBB. Florida's stranger doctrine destroys these alleged torts.

To be clear, MBB provided the radiology services at issue. There was no fraud; the Complaint lies. However, the Court need not evaluate Aetna's dishonesty to grant the MTD. The pleadings, law, and judicially noticeable facts reveal fatal defects supporting dismissal at the pleading stage.

## II.   <u>BACKGROUND</u>

### A.   <u>The Parties</u>

**MBB** is a Florida radiology group that has been operating in Florida for over 50 years, including decades as an in-network provider with Aetna. Compl. ¶¶ 20, 46-47, 54. Historically, MBB provided services in the Jacksonville area. After MBB

was acquired by RP in 2018, MBB grew to provide radiology services provided "across Florida." *Id.* ¶¶ 48, 113. As a function of MBB's growth, both the number of radiologists providing services on MBB's behalf and the number of bills submitted by MBB also increased. *Id.* ¶¶ 6, 64, 66. Aetna admits that it noticed the increase in the number of providers who were billing under MBB's Tax ID number ("TIN") and outside of the Jacksonville area. *Id.* ¶ 113. Aetna does not deny knowing precisely when and by how much MBB grew. In fact, Aetna alleges it terminated after asking MBB about the new providers. *Id.* ¶¶ 116-118. Aetna was never in the dark about the specifics of when and where MBB grew.[2]

Aetna alleges MBB billed for services rendered by "physicians … actually affiliated with *other* medical groups in Florida that are also owned by Radiology Partners." *Id.* ¶ 63. Yet, Aetna also pleads many of those physicians are listed on radiology practice websites that describe those practices as divisions of MBB.[3] *Id.*

---

[2] The industry standard CMS HCFA 1500 claim form, mandated by HIPPA for use by providers and payors, identifies the specific physician and hospital. *See* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf (fields include, among others: (1) the billing provider's National Provider Identification number (Box 33); (2) the service facility location, including the National Provider Identification number (Box 32); and (3) MBB's Federal Tax ID (Box 25)).

[3] For example, RASF is a division of MBB. *See* https://rasf.net ("Radiology Associates of South Florida is a division of Mori, Bean, and Brooks, Inc."; "References to the Practice, RASF, Radiology Partners, RadPartners and RP include its managed and owned medical practices that provide radiology services to patients throughout the United States, including Mori, Bean, and Brooks, Inc. and Lower Keys Radiology, Inc."). Aetna incorporated RASF's website by reference in its Complaint, ¶ 78. *See Parekh v. CBS Corp.*, 820 F. App'x 827, 830 n.1 (11th Cir. 2020) (plaintiff incorporated materials in the complaint via a website).

¶¶ 78, 95, 140, 154, 167, 198. Aetna cites no law against a business having divisions; Aetna itself has many. Likewise, Aetna cites no law against using subcontractors.[4]

**RP** and the practices owned and/or managed by its subsidiaries are collectively a leading physician-owned and physician-led radiology practice in the U.S.[5] Currently, RP and its affiliated practices "employ[] more than 3,900 radiologists at 3,400 sites in all 50 states." *Id.* ¶ 38. Aetna acknowledges RP provides services to its affiliated radiology practices include billing, financial, and management support. *Id.* ¶¶ 51-52.

Radiologists lead RP's affiliated practices, consistent with RP's philosophy to operate as one practice, locally led, where local radiology practices do not sacrifice clinical autonomy to realize the benefits of RP's scale.[6] Radiologists also serve as the clinical subspecialty leadership and are counted among the practice leadership serving in non-clinical roles.[7] RP's board of directors includes practicing radiologists and other doctors. *See* fn. 7.

---

[4] Even governmental payors allow providers like MBB to bill for services it provides through subcontractors. *See* 42 C.F.R. § 424.80(b)(2) (Medicare pays entities for doctors per "contractual arrangement between the entity and the supplier under which the entity bills for the supplier's services."). Thus, current and past affiliations that doctors have with other radiology practices are immaterial to whether the services at issue were provided by MBB.

[5] https://www.radpartners.com/about-us/our-practices/ (Compl. fn. 3).

[6] https://www.radpartners.com/partner-with-us/partnering-for-radiology-practices/.

[7] https://www.radpartners.com/about-us/our-team/.

**Aetna** is owned by CVS, a giant with revenues exceeding Exxon, Microsoft, Disney, Chevron, AT&T, Wells Fargo, Pfizer, and nearly everyone else.[8] Aetna alleges MBB and RP "operate to increase revenues" as though Aetna has a different goal. Aetna *collected* more than $10 billion more in premiums from its members than it *paid* in health care costs in 2021-2023.[9] Aetna attempts to smear RP for having private equity ("PE") investors but omits mentioning that Aetna also has owners to which it is accountable. Aetna also fails to mention that it is itself an enthusiastic PE investor: originally through what started in 2005 as "Aetna Ventures," now rebranded CVS Health Ventures.[10] Aetna's PE division invests in similar companies—and sometimes the very same companies as RP. CVS also buys medical groups so that it can control more of the health care industry. For example, in May 2023, CVS paid $10 billion to buy Oak Street Health, a large company with thousands of doctors and facilities in many states.[11] These types of acquisitions help CVS squeeze out providers which it does not own, like MBB, and by extension, RP.

---

[8] https://fortune.com/ranking/fortune500/.

[9] https://www.sec.gov/ix?doc=/Archives/edgar/data/64803/000006480324000007/cvs-20231231.htm (Summary of Consolidated Financial Results and Health Care Benefits Segment).

[10] *See, e.g.*, https://www.cvshealthventures.com/about.html (extolling its PE ventures for "disruptive technology enablement"); https://www.cvshealthventures.com/portfolio.html (listing nearly two dozen PE healthcare ventures); https://www.aetna.com/solutions/industry/private-equity.html (marketing "Private equity solutions that pay off" for "driving better health and engagement" with "a local team dedicated to private equity").

[11] https://www.cvshealth.com/news/company-news/cvs-health-completes-acquisition-of-oak-street-health.html. The Oak Street deal closed nearly 2 years ago, yet the front page of its website

**B.**    **Prior Arbitration Between the Parties**

Aetna falsely claims that it was unaware of what it calls "fraudulent NSA arbitrations" until October 2024. Compl. ¶ 332. Aetna lies. The reason for Aetna to falsely claim ignorance is that the law only permits overturning NSA IDR decisions when "the [alleged] fraud **must not have been discoverable upon the exercise of due diligence** prior to or during the arbitration." *See* Section V.C.2 below. But judicial notice shows Aetna knew about and asserted identical allegations against RP, and another RP affiliated group, several years ago, before the NSA Period. Request for Judicial Notice ("RJN")[12], Exs. 6-7, *see also* Exs. 3-4.

In May 2021, Singleton Associates, P.A. ("SAPA"), a Texas RP-affiliated practice, filed arbitration against Aetna for underpayments. *Id.*, Ex. 3 at 29. The same Aetna counsel as here responded with tort counterclaims like those asserted in this lawsuit. *Id.* at 6-7. Then, in January 2022, Aetna amended its counterclaims to include RP and its affiliates*,* alleging that RP "acquired Singleton in 2014," then grew through "a fraudulent scheme to obtain payments from Aetna," by causing SAPA to bill for "all of Radiology Partners' affiliated physicians interpreting images

---

fails to mention CVS or Aetna: https://www.oakstreethealth.com. This shows the folly of Aetna's allegations relying on RP-affiliated websites for its tort claims. Of course, Aetna already knew better from losing parallel website arguments in the Texas arbitration. But telling the truth now would not achieve the bogus press soundbites Aetna obtained through its dishonest court filing.

[12] "[I]n ruling on a motion to dismiss courts may supplement the allegations in a complaint with facts contained in judicially noticed materials." *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1048 (11th Cir. 2019).

at Texas hospitals." *Id.*, Ex. 6 ¶¶ 3-4. Aetna also alleged RP "acquired other group radiology practices...all over the country" and that RP's "acquisition of these practices and assumption of control and management, including through RP Management, were structured in the same or in a similar manner as Singleton." *Id.* ¶ 51. Aetna's judicially noticeable prior knowledge from the Texas arbitration defeats its copycat allegations of ignorance now.

The Texas arbitration included extensive discovery, briefing, argument and evidentiary hearings. In 2023, the Arbitrator issued a 45-page order ("Phase One Order"), on liability, that (a) rejected all of Aetna's tort allegations, including fraud, (b) found Aetna breached by underpaying SAPA, and (c) found SAPA, but not RP, breached by failing to obtain preapproval for its use of non-*locum tenens* subcontractors. RJN, Ex. 3 at 44-45; *see also* Ex. 4 at 4-6. In 2024, the arbitrator issued a 31-page order ("Phase Two Order"), which (a) rejected Aetna's alter ego allegations against RP, and (b) quantified compensatory damages for the respective breaches by Aetna and SAPA. *Id.*, Ex. 4. Both orders predate this lawsuit. Aetna then filed a premature petition to confirm parts of the orders it liked, ignoring the greater parts with many losses it didn't like, and the upcoming phases focused against it on Aetna underpayments and its attorneys fee exposure. *Id.*, Ex. 1. SAPA opposed the petition, after which the parties settled. *Id.*, Ex. 2. But settlement cannot

wipe away Aetna's judicially noticeable knowledge defeating its allegations of ignorance here.

### C.    MBB Is The Radiology Group Staffing Hospitals

Radiology is a critical hospital specialty. *See* 42 C.F.R. § 482.26. CMS mandates that all hospitals must maintain or have access to radiological services 24/7, as a condition of participation in the Federal healthcare programs. To meet these requirements, hospitals routinely enter exclusive staffing contracts with hospital-based physician specialists ("HBPs"), such as those in the field of radiology.[13] The hospital provides the equipment to take the image (*e.g.*, the PET, CT, or MRI machine), while the radiologists are needed to read and interpret those images. Once a hospital contracts with a radiology group, only the group holding that contract can provide and bill for radiology physician services at that hospital. Courts have recognized this industry norm as applicable to radiology groups.[14]

Aetna knows the hospital gets to choose which medical group holds the contract to staff the radiology department, that such group bills for the services, and

---

[13] *Cf. Radiology Prof. Corp. v. Trinidad Area Health Association*, 577 P.2d 748, 751 (Colo. 1978) ("Various services traditionally provided by specialists operating hospital specialty departments may be difficult to obtain on a regular basis unless the hospital enters into an exclusive contract").

[14] *See, e.g.*, *J. Sternberg, S. Schulman & Assocs., M.D., P.A. v. Hosp. Corp. of Am.*, 571 So. 2d 1334, 1335 (Fla. 4th DCA 1989) (affirming denial of a temporary injunction to permit radiologists to continue to practice at a hospital after that hospital entered exclusive staffing contract with another radiology group); *Young v. Naples Cmty. Hosp., Inc.*, 129 So. 3d 456 (Fla. 2nd DCA 2014) (notice of intent to initiate lawsuit given to hospital's exclusively contracted radiology group was also notice as to teleradiology company subcontracted to the exclusively contracted radiology group).

the group may use radiologists contracted from other groups. These industry norms, and Aetna's prior knowledge of them, were all addressed at length in the Texas arbitration.[15] RJN, Ex. 3 at pp. 3-4, 35-36, 40-41. Likewise, Aetna's allegations that the radiologists were not MBB doctors ignore that MBB can contract for doctors rather than directly employ them. Indeed, Aetna's own template contracts, used by Plaintiffs for over a decade, expressly reflect this industry norm permitting the use of contractors, as the Texas arbitrator highlighted. *Id.* at 36.

### D.    Aetna Harmed Patients by Forcing MBB Out-of-Network

Aetna markets itself as having a network of contracted health care providers, including hospitals, surgical centers and other facilities.[16] But Aetna harms them by making those in-network hospitals inaccessible to patients for any hospital radiology services that have out-of-network physician staffing, like MBB. For example, Aetna requires patients to obtain pre-authorization for routine mammograms and interventional radiology procedures at in-network hospitals. But if the group selected by that hospital is out-of-network, like MBB, Aetna refuses to authorize the hospital services for patients, even though despite the NSA.[17] This trick effectively makes

---

[15] *See* 42 C.F.R. § 424.80(b)(2) (Medicare pays entities for doctors per "contractual arrangement between the entity and the supplier under which the entity bills for the supplier's services.").

[16] https://www.aetna.com/individuals-families/using-your-aetna-benefits/network-out-of-network-care.html.

[17] Patients, families, and their employers often pay Aetna extra for the right to use these out-of-network services. For example, preferred provider organizations ("PPOs") typically give patients

the contracted hospitals out-of-network for these services, to the detriment of the patients, hospitals and physicians.

### E.   Terminating MBB Increased Costs for Self-Funded Plans

Since Aetna forced MBB out-of-network, MBB has won *more than 98% of the IDR disputes*, with IDREs ordering Aetna to pay more than $10.1 million more for services from mid-2022 to late 2024. Indeed, IDREs often find that the value of MBB's radiology services is multiple times more than both Aetna's initial payment for the services and Aetna's previous contracted rate with MBB. An example of this would be Aetna initially allowing[18] a radiology service at $55.86, the prior contracted rate for that radiology service being $148.40, and the IDRE ordering that the value of the radiology service was $321.26, *i.e.*, more than five times more than Aetna's initial offer and more than twice as much as Aetna's previous contracted rate with MBB.[19] *See* Compl., Ex. A, at p. 378, Disp-1597905.

---

the right to go out-of-network to receive treatment, yet Aetna still routinely denies authorization for PPO members to use in-network hospitals for MBB's services (because MBB is out of network). Similarly, while HMOs often direct patients to use in-network providers, Aetna markets its HMOs as permitting patients to use the listed in-network hospitals, without disclosing that this permission is a mirage for any radiology services that are out of network. Aetna uses these bait-and-switch tactics to deprive patients of the coverage they thought they had purchased.

[18] An "allowed" amount in the context of medical billing includes both the amount paid by the patient and the amount paid by the health insurance company.

[19] Relative to the amounts provided for on the Medicare fee schedule, these amounts represent an example where Aetna's initial offer is 80% of the Medicare rate, *i.e.*, the rate paid by the government for the elderly and poor, Aetna's prior contracted rate was 210% of the Medicare rate, and the IDRE ordered Aetna to pay 461% of the Medicare rate.

Aetna also has been ordered to pay the IDREs over $11 million for administrative and IDRE fees. The righteous fury performance art in Aetna's Complaint omits that Aetna passes the additional adjusted payments to MBB and the administrative fees to its self-funded plans, even though these are costs that Aetna could readily have avoided by entering into a new network agreement with MBB. Moreover, this occurs after Aetna has charged its self-funded plans customers for purported "shared savings" based on its initial payment to MBB relative to MBB's charges. Then, the employers sponsoring the self-funded plans foot the bill when MBB received more after the NSA process.[20]  Thus, Aetna cheats everyone—the patients, the self-funded plans, and MBB.[21]

Aetna could have avoided its alleged victim status in the NSA IDR process by negotiating a new contract with MBB. Between June 2022 and October 2024, the parties negotiated extensively for a new in-network contract to cover MBB across Florida, including an agreed upon a rate for services, and were in the final stages of contract language tweaks. But after losing the last alleged torts in the Texas arbitration in September 2024 and settling that case for likely less than its legal

---

[20] This explains why Aetna has refused repeated efforts and proposals to enter into network contracts at rates far below the costs being incurred by Aetna under the NSA process and even shown zero interest in a standstill agreement offered by MBB, where it could avoid incurring all these costs for its self-funded plans, even without a new contract with MBB.

[21] Aetna has been sued before by employers for cheating them. *E.g.*, *Kraft Heinz Co. Employee Benefits Admin. Bd., et al. v. Aetna Life Ins. Co.*, 2:23-cv-00317, E.D. Tex., ECF No. 1, filed June 30, 2023 (alleging Aetna breached its fiduciary duties to pocket millions siphoned away in undisclosed improper administrative fees).

expenses to bring it, Aetna unilaterally reversed course, went silent for over a month, then launched this copycat lawsuit on Christmas eve.

### F.    The NSA Governs MBB's Reimbursement Out-of-Network

MBB submits bills to Aetna for services MBB provides to Aetna's members. During the Contracted Period, Aetna was contractually required to reimburse MBB pursuant to the terms of the parties' Contract that was effective until July 1, 2022. During the subsequent NSA Period, Aetna's reimbursement to MBB is governed by the NSA, which has been effective since January 1, 2022.

### 1.    The NSA Protects Patients Who Received Out-Of-Network Care from Medical Groups at In-Network Facilities

When a hospital chooses a medical group to staff a specialty department and gives that group the right to bill, the medical group bills for the services provided by the doctor (the professional component) and the hospital bills for the use of the facility involved in the service (the technical component). This two-tracked billing system, and the fact that insurance companies may choose to contract with a hospital, but not the staffing medical group, means that patients can receive services from out-of-network hospital-based specialists even when the hospital is in-network.

Congress enacted the NSA, in part, to protect patients from these types of "surprise medical bills." Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (2020). Under the NSA, Aetna makes initial payments to out-of-network

providers based on its QPA[22], followed by an IDR process for any payment disputes. *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C). Unresolved disputes are settled by a "baseball-style" arbitration under the supervision of CMS, the agency that oversees and vets IDREs. *See generally* 42 U.S.C. § 300gg-111. The NSA has this process because reimbursement for out-of-network services typically is higher than the discounted rates that contracted providers extend in exchange for the benefits of being in-network. Congress just took the patients out of the middle.

### 2. The NSA Allows Aetna to Challenge Whether Medical Bills Are Eligible During the IDE Process

The NSA IDR process includes timeframes in which Aetna is required to raise any contention that services MBB submits to the NSA IDR are not eligible for the NSA, including because the services are contracted in-network services with another medical group, as Aetna now contends here.[23] Aetna offers no contention or exhibit to its Complaint to establish it ever once made such an eligibility challenge before the IDREs, despite literally ***thousands*** of chances to do so.

---

[22] The QPA is intended to be calculated off a payor's in-network contracted rates. But CMS audits have found Aetna's QPA calculations unreliable for multiple reasons, such as improperly using claim paid instead of contracted rates, and counting each claim as its own contracted rate, even when the claims were for the same amounts for the same item or service and to the same provider of air ambulance services. *See* https://www.cms.gov/files/document/qpa-final-report-aetna-tx.pdf; *see also* https://www.cms.gov/cciio/resources/forms-reports-and-other-resources/downloads/state-of-florida.pdf (concluding that Aetna failed to provide certain required disclosures regarding the QPA with an initial payment or a notice of denial of payment); https://www.cms.gov/cciio/resources/forms-reports-and-other-resources/downloads/school-board-of-broward-county.pdf (same).

[23] *See* Guidance for Disputing Parties, https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf, p. 16.

i.   **Aetna Never Raised Eligibility During the NSA Negotiations**

CMS has promulgated guidance regarding the NSA timelines, which provide for a 30-day period[24] from the receipt of the claim for the health plan to make an initial payment or issue a notice of denial of payment.[25] If a provider is dissatisfied with the health plan's initial determination, it may send an "Open Negotiation Notice" to kick off a mandatory 30-day negotiation period regarding the payment amount. During this time, a provider must provide the TIN and provider name, and the parties may continue to communicate regarding the disputed claim.[26] Thus, for all the NSA IDR disputes listed in Exhibit A to the Complaint, Aetna knew full well the relevant individual providers and could have raised with MBB whether those individual radiologist's claims were NSA eligible. Only after the 30-day negotiation period may either party initiate the IDR process.

---

[24] This 30-day period is intended for health plans an opportunity to ask providers for information on "whether the services are subject to the protections of the [NSA]. *See* Guidance for Disputing Parties, https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf, p. 10; *see also* Frequently Asked Questions (FAQs) About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 62 (October 6, 2023), *available at* https://www.cms.gov/files/document/faqs-part-62.pdf.

[25] *See* Guidance for Disputing Parties, https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf, p. 17, § 5.5.

[26] *See* https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/open-negotiation-notice.pdf. The NSA rulemaking recognizes the TIN as an identifier of the provider rendering an item or service. *See* 86 Fed. Reg. 55994 ("Items and services are billed by the same provider or group of providers or facility or same provider of air ambulance services if the items or services are billed with the same National Provider Identifier (NPI) or [TIN]."); *see also* 86 Fed. Reg. 56064 ("By allowing groupings of providers with the same TIN, this will allow group practices to batch together qualified IDR items or services.").

17

ii.    **Aetna Never Raised Eligibility During the NSA IDR Process**

The IDR process after the open negotiation period also requires that "[i]f the non-initiating party [Aetna] believes that the Federal IDR Process is not applicable, the non-initiating party must notify the Departments … as part of the certified IDR entity selection process. This information must be provided not later than **1 business day** after the end of the 3-business-day period for certified IDR entity selection…."[27] The IDRE is required to determine that the dispute is eligible for the IDR process, and if eligibility is challenged, the IDRE can ask for documents and/or an explanation justifying the parties' respective positions.[28] Yet, Aetna raised no such challenges with the IDRE; tellingly, it does not allege here that it did.

Rather, Aetna lay in wait until after those disputes were adjudicated, presumably hoping the IDRE would rule for Aetna instead of MBB. The NSA does not permit Aetna simply to skip availing itself of the eligibility protections under the NSA, tell a court it was too busy to exercise its administrative rights to "investigate the accuracy of each claim before making the decision to pay it," and then ask this

---

[27] *See* Guidance for Disputing Parties, https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf, p. 16, § 5.5.

[28] *See* 45 C.F.R. § 149.510(c)(1)(v) ("[T]he certified IDR entity selected must review the information submitted in the notice of IDR initiation to determine whether the Federal IDR process applies. If the Federal IDR process does not apply, the certified IDR entity must notify the Secretary and the parties within 3 business days of making that determination."). If eligibility is challenged, the IDRE can ask for documents and an explanation for the parties' respective eligibility positions. *See* Technical Advice for Certified IDR Entities, August 2022, https://www.cms.gov/files/document/TA-certified-independent-dispute-resolution-entities-August-2022.pdf at 10-11.

Court to vacate the many tens of thousands of NSA IDR losses it incurred fair and square before an independent adjudicator. Compl. ¶ 260. In Aetna's legal construct, no NSA outcome is final, and it need never be accountable to follow NSA rules.

## III.  STANDARD OF REVIEW

Rule 8(a) requires that "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" to survive a motion to dismiss.[29] Rule 9(b) further requires that claims sounding in fraud must be plead with particularity. Thus, Aetna must (but did not) plead the "who, what, when, where, and how of the fraud alleged."[30] "[A] plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud."[31]

## IV.  AETNA CANNOT GET PRIOR RESTRAINT ON SUBMISSIONS TO THE NSA IDRE PROCEEDINGS (COUNTS EIGHT, TEN, ELEVEN)

### A.  Aetna Seeks Relief That Unlawfully Interferes with the NSA's Administrative Process

The NSA creates a comprehensive dispute resolution process for payors and providers to resolve out-of-network payment and provides no authority for parties to have the Judicial Branch, through an Article III court, enjoin or declare that a

---

[29] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[30] *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022).

[31] *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

provider or payor cannot use the IDREs. *See generally* 42 U.S.C. § 300gg-111(c)(5)(E)(i). Yet that is exactly what Aetna seeks when it requests this Court issue prospective injunctive and declaratory relief, targeted at limiting participation by MBB and RP in the NSA's IDR process. Compl. ¶¶ 15, 317, 343, 347, 354. The remedy available to Aetna for an allegedly ineligible claim from a provider is outlined in the NSA.

Specifically, the NSA allows Aetna to raise the challenge with the IDRE, not with a court. If the IDRE finds the claim is ineligible, the IDRE can "close the dispute due to the inapplicability of the Federal IDR process."[32] Yet Aetna made no such challenge to any IDRE and alleges none in the Complaint.

The NSA only provides for post-award review, and even then, it restricts judicial review to the very limited circumstances for challenging awards under the Federal Arbitration Act ("FAA"). 42 U.S.C. § 300gg-111(c)(5)(E)(i). Thus, Aetna's counts seeking injunctive or declaratory relief should be dismissed or stricken.[33]

---

[32] *See* Technical Advice for Certified IDR Entities, August 2022, https://www.cms.gov/files/document/TA-certified-independent-dispute-resolution-entities-August-2022.pdf at 10-11.

[33] Federal courts have found lawsuits seeking unavailable remedies can be challenged by either motion to dismiss under Rule 12(b) or motion to strike under Rule 12(f); and courts can treat either as the other to discard unavailable remedies. *See, e.g., Simmons v. Royal Caribbean Cruises, Ltd.*, 423 F. Supp. 3d 1350, 1352 (S.D. Fla. 2019) (court ruled motion to dismiss punitive damages should be treated as motion to strike under Rule 12(f), and struck remedy as unavailable at law); *Brown v. Seebach*, 763 F. Supp. 574, 583 (S.D. Fla. 1991) (motion to strike unavailable remedies for loss of future earnings, attorneys fees and prejudgment interest granted).

**B.     Aetna Failed to Exhaust Its Administrative Remedies Under the NSA and ERISA; Dismissal is Required**

In a case before this Court, "Aetna argue[d] that a plaintiff is required to exhaust 'all available administrative remedies' prior to bringing suit in district court." *Tindell v. Tree of Life, Inc.*, 672 F. Supp. 2d 1300, 1305 (M.D. Fla. 2009). The Court agreed: "Generally, if an individual fails to exhaust the administrative remedies, that person's claim is barred" and "the courts strictly enforce the exhaustion requirement." *Id.* at 1306. The Court noted: "[a]lthough not required by the text of ERISA, exhaustion is a court-imposed requirement based on the interpretation of the statute and congressional intent." *Id.* (citing *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003)).[34] Aetna failed to plead facts to support it exhausted its administrative remedies.[35] This requires dismissal.

---

[34] Aetna has successfully made the same exhaustion argument. *Manorcare Potomac v. Understein*, No. 8:02-CV-1177-T-23EAJ, 2002 WL 31426705, at *1 (M.D. Fla. Oct. 16, 2002) ("Understein's failure to exhaust administrative remedies robs this Court of subject matter jurisdiction over this action."); *La Ley Recovery Sys.-OB, Inc. v. Aetna Health Ins. Co.*, No. 14-22773-CIV, 2014 WL 7530327, at *1 (S.D. Fla. Aug. 28, 2014) ("The Court does, however, agree with Defendant that Plaintiff has failed to properly allege exhaustion of administrative remedies. … A bare allegation that a plaintiff has 'complied with 'all conditions precedent' or in the alternative that 'such conditions have been waived or excused' does not address the exhaustion requirement.").

[35] The Eleventh Circuit has stated many reasons why administrative processes should be followed before resort to judicial intervention, including: "(1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that "frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people

## V.  AETNA CANNOT VACATE THE IDR AWARDS (COUNT 9)

### A.    The NSA Adopts the Narrow Standards of the FAA for Challenging Awards by IDR Arbitrators

The Complaint seeks to vacate the IDR awards under fraud theories. As such, Aetna's burden of proof to vacate each IDR award must also meet the particularity requirement for alleging fraud under Rule 9(b), applied to the very narrow confines for pursuing fraud under the FAA, as adopted by the NSA. The NSA provides that IDR arbitrator decisions are **binding** and "**shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9**" of the FAA.[36] 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II); confirmed by *Med-Trans Corp. v. Cap. Health Plan, Inc.*, 700 F. Supp. 3d 1076 (M.D. Fla. 2023).

Furthermore, while the first subsection of 42 U.S.C. § 300gg-111(c)(5)(E)(i) provides that an IDR decision "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim," this Court has held that the subsection's reference to fraud does **not** expand the scope of judicial review beyond

---

to ignore its procedures." *Alexander v. Hawk*, 159 F.3d 1321, 1327 (11th Cir. 1998). And the Eleventh Circuit has held that "both the practical considerations and the guiding principles of exhaustion dictate that [] claimants should make their claims to the agency and exhaust their administrative remedies before the federal court would have jurisdiction to review the agency decision." *Crayton v. Callahan*, 120 F.3d 1217, 1222 (11th Cir. 1997) (emphasis added).

[36] Any potentially conflicting state law fraud claims are preempted by the FAA fraud standards incorporated into the NSA. *Fla. Dept. Ins. v. Debenture Guar.*, No. 95-1826-CIV-T-17E, 1996 WL 173008, at *2 (M.D. Fla. Apr. 1, 1996) ("this Court expressly found that Title 9 is substantive federal law preempting conflicting state laws.").

the FAA prongs. *Med-Trans Corp.*, 700 F. Supp. 3d at 1085, *appeal dismissed*, No. 24-10134, 2024 WL 3402119 (11th Cir. May 30, 2024).

"Judicial review of arbitration decisions is among the narrowest known to law," and vacatur is only allowed in "very unusual circumstances." *Gherardi v. Citigroup Glob. Markets Inc.*, 975 F.3d 1232, 1237 (11th Cir. 2020). A court "may revisit neither the legal merits of the award nor the factual determinations upon which it relies." *Wiand v. Schneiderman*, 778 F.3d 917, 926 (11th Cir. 2015). As this Court has acknowledged, "an arbitration award will fall under § 10(a) only in 'very unusual circumstances.'" *Med-Trans Corp*., 700 F. Supp. 3d at 1085 (*quoting First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). As noted by Chief Judge Corrigan: "The bottom line is that courts review arbitration awards with deference and restraint, interpreting the § 10(a) categories narrowly. Thus, challenges…to NSA IDR awards may rarely succeed." *Id*.

## B.    Aetna *Knows* Limits Exist to Challenging IDRE Awards

Aetna asserts that judicial review is appropriate primarily under paragraph 1 of Section 10(a) of the FAA: "where the award was procured by corruption, fraud, or undue means." Compl. ¶ 324, *citing* 9 U.S.C. §10(a)(1). But Aetna has not met this standard and ***knows*** it, given its recent win in *Guardian Flight, LLC v. Aetna Health Inc.*, 711 F. Supp. 3d 662 (S.D. Tex. 2024).

In *Guardian*, an out-of-network provider and Aetna entered the NSA IDR process. *Id.* at 667. The provider asked Aetna for information regarding its calculation of the QPA, but Aetna refused. *Id.* The IDRE nonetheless sided with Aetna's proposed rate. *Id.* The provider sued alleging Aetna misrepresented its QPA. *Id.* Aetna filed a motion to dismiss claiming that the provider "fail[ed] to properly allege corruption, fraud, or undue means to trigger judicial review of the IDR awards." *Id.* at 672. The provider argued that "misrepresentations of facts are a type of 'undue means,' which triggers judicial review." *Id.* The court disagreed.

Based on the FAA's strict requirements, the *Guardian* court granted Aetna's motion to dismiss, finding that the plaintiffs' alleged misrepresentation of fact by Aetna alone—without any undue means, like bribery, undisclosed bias of an arbitrator, or willfully destroying or withholding evidence—fell woefully short of alleging fraud. *Id.*[37] The same result is warranted here. Aetna does not allege bad faith by the arbitrators, that MBB or RP bribed the arbitrators, that the arbitrators were biased, or that MBB or RP was willingly destroying or withholding evidence.

---

[37] Citing *Med-Trans Corp.*, the *Guardian* court explained, "as Chief Judge Corrigan wisely opined, the NSA uses exclusive language regarding when judicial review is permitted—only when one of the four paragraphs in Section 10(a) of the FAA is triggered… Otherwise, judicial review is prohibited…" *Id.* The court then considered whether misrepresentations alleged by the provider were sufficient to support "fraud or undue means to procure [] IDR awards that would fall within the ambit of Section 10(a)." *Id.* The court held fraud in this context requires "a showing of bad faith during the arbitration proceedings, such as bribery, undisclosed bias of an arbitrator, or willfully destroying or withholding evidence." *Id.* at 673. The court also noted: "Undue means connotes behavior that is 'immoral if not illegal' or otherwise in bad faith." *Id.* (citations omitted; emphasis added). Finally, the court explained Section 10(a) requires a nexus between the alleged fraud or undue means and the basis for the arbitrators' decision. *Id.*

Aetna relies on allegation that "the providers that MBB and RP billed using MBB's TIN worked for medical groups other than MBB, rendering these representations false." Compl. ¶ 256. Taking Aetna's allegations as true—which they are not—Aetna relies on a misrepresentation of a fact; not on the arbitrator bribery or bad faith that Aetna has admitted to other courts is required.[38]

## C.    Aetna's Pleadings and Judicial Notice Gut Its Fraud Arguments

Aetna cannot invoke fraud-based arguments to challenge arbitration awards without alleging, with particularity, each of the following: (1) fraud "by clear and convincing evidence," (2) "the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration," and (3) "the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration." *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988). "All three prongs must be met." *Floridians for Solar Choice, Inc. v. Paparella*, 802 Fed. App'x 519, 523 (11th Cir. 2020). Here, the pleadings and judicial notice preclude Aetna from establishing the first or second prong.[39]

---

[38] Any inconsistent positions asserted here by Aetna from what it successfully argued in the *Guardian* case should be rejected based on the doctrine of judicial estoppel. *See, Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180-81 (11th Cir. 2017) ("the doctrine of judicial estoppel rests on the principle that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory…") (internal citations omitted). Courts should apply judicial estoppel when, "(1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were calculated to make a mockery of the judicial system." *Id.*

[39] Since there is no fraud, the third prong cannot be satisfied.

**1.    Prong One: Aetna Failed to Allege Sufficient Facts to Establish Fraud by Clear and Convincing Evidence**

Aetna's fraud theory is premised on allegations that MBB submitted claims to the NSA's IDR process for services that MBB did not actually provide. Aetna contends that the rendering physicians could not have been working for MBB because they allegedly worked for other medical groups who Aetna insists should have billed for the services. Compl. ¶¶ 9, 325-326. The only alleged "facts" to support this theory are (1) MBB grew, and (2) MBB submitted bills where the doctors listed allegedly were or are also employed by other practices. Yet, Aetna's Complaint refers to websites where those physicians' practices are identified as divisions of MBB. Aetna provides no support for its theory that doctors ***cannot*** provide services as employees or contractors of MBB, at hospitals MBB staffs. Courts in Florida have confirmed that the hospital chooses who staffs the radiology department, and *that* chosen group, not other groups, is the provider. *See* fn. 14.

Aetna fails to allege, for any of the bills at issue, either that MBB lacked a staffing contract with the hospital, or that any other group owned the staffing contract with that hospital. Thus, Aetna's allegations are insufficient to close the loop needed to establish fraud by clear and convincing evidence or otherwise.

Aetna also failed to allege the required particularity to support damages given the lack of any facts supporting that MBB did not hold the facility contracts, or that any other groups did hold those contracts. Aetna's alleged lower-rate contracts with

other groups mean nothing unless Aetna alleges that those groups, not MBB, owned the hospital staffing contract that provides the exclusive right to bill at that hospital. Aetna makes no such allegations.

### 2.    Prong Two: Aetna Cannot Show Lack of Knowledge

Aetna claims the alleged fraud was not discoverable "until October 2024." Compl. ¶ 332. But the Complaint's allegations and judicially noticeable facts readily show that Aetna *knew* of MBB's growth before the NSA period.[40] *Id*. ¶ 62 (claiming increased number of physicians billing); ¶¶ 113-118 (same).

Further, Aetna is bound by its own prior admissions[41] in the 2022 Texas FAC, which establishes that Aetna had sufficient knowledge to be put on inquiry notice here. *See* Texas FAC, 51, ¶ 3-4. The Texas FAC, which predates the NSA Period, alleged that the Texas RP-affiliated radiology practice "engaged in a fraudulent scheme to obtain payments from Aetna" by causing that practice to bill for "all of [RP's] affiliated physicians interpreting images at Texas hospitals." *Id.* Aetna's nearly identical allegations, in combination with Aetna's admitted knowledge of

---

[40] In fact, Aetna admits that RP's growth was publicly known and available as early as 2019. *See* Compl. ¶¶ 39-40, 43. Aetna itself provides examples of billing dating back to 2019 (*id*. ¶ 104), and subsequent discussions with MBB about increased numbers of claims in different counties (*id*. ¶¶ 113-17), that it contends justified the termination of the Contract in 2022. *Id*. ¶ 118.

[41] *Chick-Fil-A, Inc. v. CFT Dev., LLC*, 652 F. Supp. 2d 1252, 1260 (M.D. Fla. 2009) ("[A]dmissions in pleadings[s] are deemed judicial admission[s], binding on the party who makes them.")

MBB's affiliation with RP, required Aetna to exercise due diligence during the NSA IDR process, which Aetna did not do.

### D.    The Arbitrators Did Not Exceed Their Powers

Aetna also seeks judicial review because the "arbitrators 'exceed[ed] their powers,'" under 9 U.S.C. § 10(a)(4).[42]  Compl.  ¶¶ 329-31.  Judicial review of arbitration decisions is "among the narrowest known to the law." *Bamberger Rosenheim, Ltd. v. OA Dev., Inc.*, 862 F.3d 1284, 1286 (11th Cir. 2017). The Eleventh Circuit, following Supreme Court precedent, has "interpreted § 10(a)(4)'s language narrowly—very narrowly." *Gherardi*, 975 F.3d at 1237. "Arbitrators do not exceed their powers when they make errors, even 'a serious error.'" *Id*. (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)).

Aetna contends the arbitrators in the IDR proceedings were induced to exceed their powers by Defendants' alleged fraud, such that the arbitrators rendered awards in cases where the healthcare provider was in-network with Aetna and not eligible for the IDR process. Compl. ¶¶ 329-31. But this just circles back to the defective fraud allegation and fails for the same reasons the fraud allegations fail.

---

[42] Aetna miscites this as 9 U.S.C. § 10(a)(2). In fact, Section 10(a)(2) is only "where there was evident partiality or corruption in the arbitrators, or either of them;" an allegation Aetna does not make (and cannot). By contrast, Section 10(a)(4) addresses "where the arbitrators **exceeded their powers**, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." (emphasis added). Whether Aetna meant to refer to 10(a)(2) or 10(a)(4), the pleadings are insufficient to support either.

Similarly, Aetna has not alleged any facts to support its contention that MBB's claims were not eligible for the NSA's IDR process. There are no allegations that MBB lacked the radiology department staffing contract at any hospital or lacked a contract for the radiologists to provide services for MBB at that hospital, for any bill. Aetna left out the critical component to its theory that some group other than MBB was the provider,[43] and it cannot overturn the awards on this basis.

## VI.    AETNA'S OTHER COUNTS FAIL TO STATE A CAUSE OF ACTION

### A.    Aetna's Tortious Interference Claims Fail (Count 2)

Aetna's tortious interference claims in Count 2—claiming interference with in-network agreements—fail because Aetna's allegations prevent it from saying that RP and its affiliated groups are "strangers."[44]

"The elements of tortious interference with a contract or business relationship are [among others]:…(3) an intentional and **unjustified** interference with the relationship by the defendant…**For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship**." *See Salit v. Ruden, McClosky*, *Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385 (Fla. 4th DCA 1999) (emphasis added). "A defendant is not a

---

[43] Like in the Texas arbitration, Aetna has no legal authority that a radiologist cannot previously or simultaneously be employed or contracted with more than one medical group, or that groups other than the one that owns the department staffing contract should bill for services there. This striking gap reflects the house of cards on which Aetna's entire false narrative has been built.

[44] The parts of Aetna's tortious interference claim in Count One pertaining to the Contracted Period are subject to arbitration and will also be shown in that forum to fail for the same reasons.

'stranger' to a business relationship if the defendant 'has any beneficial or economic interest in, or control over, that relationship.'" *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (quoting *Nimbus Tech., Inc. v. SunnData Prods., Inc.*, 484 F.3d 1305, 1309 (11th Cir. 2007)).

Count 2 alleges that RP tortiously interfered with the contractual relationship "between Aetna and the other medical groups **acquired by**" RP. Compl. ¶ 226 (emphasis added). Aetna repeatedly pleads that RP owns the other medical groups. *Id*. ¶¶ 48, 63, 219, 230. This alone is sufficient to make RP not a "stranger" to the business relationship and defeat the interference count. But there's more. Aetna also alleges that RP "had and continues to have **complete control** over the operations of [its affiliated medical groups], **provides full financial and management support**, and **takes all residual benefits and bears all residual losses** from the medical groups' operations." *Id*. at ¶ 51 (emphasis added). The Complaint cannot satisfy the requirement that the alleged interference was by a "stranger" to the Contracts, because Aetna is bound to its inconsistent admissions in its pleadings[45].

### B. Aetna's Fraud (Count 3) and Negligent Misrepresentation and Omission (Count 4) Allegations Cannot Survive

Aetna's fraud and negligent misrepresentation counts for the NSA Period are based on its allegations that claims were submitted to the IDR process using MBB's

---

[45] *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177-78 (11th Cir. 2009) (recognizing that "[t]he general rule is that a party is bound by the admissions in his pleadings" and that "judicial admissions are binding." (Cleaned up.)

TIN for providers who worked for other medical groups. *Id*. ¶¶ 256, 269, 273, 274, 279. They fail for reasons addressed above on Count 9, as well as those that follow.

### 1.    State Law Cannot Interfere With the NSA

As discussed above in Section IV, *supra*, Aetna cannot expand on the NSA's strict limits on vacating awards or use fraud allegations to get a prior restraint to enjoin Defendants from submitting claims to the NSA's IDR process; any state law with a different result is preempted. The same applies to Aetna's attempt to use state law counts for fraud and negligent misrepresentation to circumvent the NSA.

### 2.    Aetna Lacks the Particularity Needed to Plead these Counts

Florida law requires a plaintiff to plead specific allegations to state a fraud claim: "(1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party." *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1299 (S.D. Fla. 2017). All four elements of a fraud claim must be pled with particularity. *Reina v. Gingerale Corp.*, 472 So. 2d 530, 531-32 (Fla. 3d DCA 1985) (citing Fla. R. Civ. P. 1.120(b)).

Likewise, "[t]o state a claim for negligent misrepresentation or omission, a plaintiff must allege; (1) a misrepresentation of material fact; (2) that the representor either knew or should have known was false or made without knowledge of truth or

falsity; (3) the representor intended to induce another to act on the misrepresentation; and (4) that injury resulted to plaintiff acting in justifiable reliance on the misrepresentation." *Behrman v. Allstate Life Ins. Co.*, No. 04-60926-CIV, 2005 WL 8154572, at *3 (S.D. Fla. Mar. 24, 2005). And, because negligent misrepresentation also "sound in fraud," it also must be pled with Rule 9(b) particularity. *Linville v. Ginn Real Est. Co., LLC*, 697 F. Supp. 2d 1302, 1306 (M.D. Fla. 2010).

Aetna fails to state specific facts to support a fraud or misrepresentation claim:

1.    <u>No Specific False Statement</u>. Aetna has not identified *any* specific false statement made by MBB for any specific billed claim. While the Complaint refers to certain doctors' online profiles to suggest they are employed by other groups (Compl. ¶¶ 140-178), Aetna fails to allege that (a) MBB lacked the staffing contract at the hospitals where these services were performed, (b) MBB lacked a contract with the other groups to get services from any of these doctors, or (c) any of the other groups had the staffing contract at the hospitals for the services at issue.

2.    <u>No Specific Intent</u>. Aetna has not plead with specificity any facts that would support the allegation that Defendants intended to knowingly defraud Aetna or induce Aetna to rely on any allegedly false statement for any specific bill.

3.    <u>No Specific Reliance</u>. Aetna has not plead specific reliance on any purportedly fraudulent statement for any specific bill. Moreover, as discussed above in Section V.C.2, Aetna's pleadings and judicial notice establish that Aetna knew,

or could have known through due diligence, the facts that it now alleges are "fraud." Thus, even if Aetna had tried to allege reliance on any specific statement for a specific bill (which it didn't allege), these counts still would fail as a matter of law.

### C.    Aetna Fails to State a Claim for Civil Conspiracy (Count 5)

The alleged conspiracy count fails for at least three reasons:

#### 1.    Conspiracy Does Not Work Among Related Entities

"[R]egardless of the cause of action alleged, a conspiracy requires that the individual conspirators make up 'a combination of separate economic groups or forces.'" *Risk Ins. & Reinsurance Sols. v. R+V Versicherung*, No. 04-61119-CIV, 2007 WL 9700868, at *9 (S.D. Fla. June 6, 2007) (citing *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So.2d 1025, 1029 (Fla. 3d DCA. 1981)). A parent corporation, its wholly owned subsidiary and its employees and officers "cannot constitute the requisite combination of 'separate economic groups or forces' necessary to establish the Florida tort of conspiracy." *Id*. Here, Aetna alleges a conspiracy between RP and groups it allegedly acquired. Because Defendants are not "separate economic forces," Aetna's conspiracy claim fails.

#### 2.    No Underlying Tort Supports a Conspiracy Count

"Florida does not recognize civil conspiracy as a freestanding tort." *Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1136 (Fla. 3d DCA 2018) (citing *SFM Holdings Ltd. v. Banc of Am. Secs., LLC*, 764 F.3d 1327, 1338-39 (11th

Cir. 2014)). "The gist of a civil conspiracy is not the conspiracy itself, but the underlying civil wrong occurring pursuant to the conspiracy and which results in the plaintiff's damages." *Id*. "The conspiracy does not give rise to an independent cause of action, but is a device to allow a plaintiff to spread liability to those involved in causing the underlying tort." *Id.* The conspiracy, therefore, is inextricably linked with the underlying tort." *Id*. Each of Aetna's tort claims are subject to dismissal; thus, its conspiracy claim also fails.

### 3.    Aetna Has Not Met the "Coercion" Exception

Aetna half-heartedly attempts to plead, in the alternative, a rare exception under Florida law that permits a stand-alone claim for conspiracy, in the very limited situation where the conspiracy creates a "peculiar power of coercion." Compl. ¶ 286. But summarily alleging a "peculiar power of coercion" is not enough.

"The distinguishing features of an independently actionable conspiracy are: (1) some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess;"[46] and "(2) a malicious purpose to harm the plaintiff." *Gould v. Sacred Heart Hosp. of Pensacola*, No. PCA 86-4392-RV, 1988 WL 1017208, at *12 (N.D. Fla. June 29, 1988). "The 'force of numbers'/'peculiar power of coercion' exception is intended to be a narrow one."

---

[46] Aetna's own cited case confirms this. Compl. ¶ 286 (citing *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006)).

*Espana Informatica, S.A. v. Top Cargo, Inc.*, No. 08-20276-CIV, 2008 WL 11331683, at *11 (S.D. Fla. Apr. 28, 2008). "The typical case for the 'peculiar power' exception—also referred to as the 'force of numbers' exception—is the case of a group boycott to 'blacklist' someone from a given industry." *Hvide v. Holt Fin. Ltd.*, No. 20-22266-CIV, 2021 WL 8154846, at *10 (S.D. Fla. Sept. 13, 2021) (citations omitted). Aetna fails to allege any type of anti-competitive boycotting. Nor does it allege "a malicious purpose to harm" itself.

### D.    Aetna's "Money Had and Received" and Unjust Enrichment Counts Fail (Counts 6 and 7)

Aetna's counts for "Money Had and Received" and Unjust Enrichment also fail.[47] As stated above, Aetna cannot circumvent the NSA's limited remedies through state law causes of action. *See* Section IV.B. Unjust enrichment or "money had and received" are not bases for overturning such awards.[48]

### E.    Aetna's Florida's Deceptive and Unfair Trade Practices Act Count Fails ("FDUTPA") (Count 8)

Aetna appends the same core fraud-based narrative from all the other counts to this one by slapping on the label "Deceptive and Unfair Trade Practices." Compl.

---

[47] These counts also fail under the Contracted Period. "As a general matter, the existence of an express contract precludes recovery under unjust enrichment and money had and received." *Francois v. Hatami*, 565 F. Supp. 3d 1259, 1270 (S.D. Fla. 2021). But this is for the arbitrators.

[48] Also, redundant counts cannot proceed together. *See Ultimate Motors, Inc. v. Lionheart Motorcars, LLC*, No. 19-60917-CIV, 2019 WL 9786489, at *5 (S.D. Fla. July 23, 2019) ("the Court will dismiss [plaintiff's] claims for money had and received and restitution as duplicative of its unjust enrichment claim."); *A&M Mgmt. Inc. v. Deme*, No. 18-63099-CIV, 2019 WL 7344821,

¶¶ 308-318. As discussed, state law counts cannot be used to circumvent the very strict limited circumstances under the NSA for vacating IDRE awards or result in a prior restraint on submitting new claims to the NSA. *See* Section IV.B. This alone is sufficient grounds to dismiss the FDUTPA count.

To plead a deceptive or unfair act as the basis for a FDUTPA claim, Aetna also must allege an "objective deception." *See Democratic Republic of the Congo v. Air Capital Group, LLC*, 614 Fed. Appx. 460, 470 (11th Cir. 2015). Moreover, the fraud-based nature of Aetna's underlying theory means Rule 9(b) particularity is also required. *Llado-Carreno v. Guidant Corp.*, No. 09-20971-CIV, 2011 WL 705403 *5 (S.D. Fla. Feb. 22, 2011) (applying Rule 9(b) to FDUTPA claims: "[t]he particularity requirement of Rule 9(b) applies to all claims that sound in fraud, regardless of whether those claims are grounded in state or federal law.").[49]

Accordingly, Aetna must allege, with particularity: (1) a plausible theory that identifies a specific act recognized in law as objectively deceptive or unfair; (2) the names, dates, and other specific facts supporting its theory that such deception occurred; (3) the particular facts surrounding Aetna's reasonable behavior in being misled; and (4) the specific recoverable actual damages that it suffered as a result of

---

at *5 (S.D. Fla. May 14, 2019) ("Plaintiffs' claim for money had and received is due to be dismissed as duplicative of their unjust enrichment claim.").

[49] *Blair v. Wachovia Mort. Corp.*, No. 5:11-cv-566-OC-37TBS, 2012 WL 868878 *3 (M.D. Fla. Mar. 14, 2012) (dismissing a FDUTPA for lack of particularity pled, reasoning "where the gravamen of the claim sounds in fraud, as here, the heightened pleading standard of Rule 9(b) would apply.").

the particularized deception. *See State Farm Mut. Auto. Ins. Co. v. Performance Orthopedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307 (S.D. Fla. Sep. 25, 2017).

Aetna has failed to allege anything to support any of these requirements; it fails to identify any specific deceptive or unfair act for any specific bill at issue, that Aetna detrimentally relied on any specific false statements, was misled, or that it would be reasonable to have been misled. *See also* Section VI.B. This count fails.

**F.    Aetna is Not Entitled to Declaratory and Injunctive Relief under ERISA § 502(a)(3) and 28 U.S.C. §§ 2201 and 2202 (Count 10)**

**1.    Aetna's ERISA Claim Attempts to Circumvent the NSA**

Once again, Aetna has alleged a count attempting to circumvent the NSA. Aetna presents zero authority for the notion that Congress's decision to create NSA proceedings under the supervision of CMS, and impose restrictions on challenging awards by IDRE arbitrators, can be overcome by arguing that ERISA applies.

**2.    The ERISA Claim Impermissibly Seeks a Legal Remedy**

Aetna's count for overpayments under ERISA § 502(a)(3), which seeks nothing more than recoupment of money, is an action brought in law, not equity, and is therefore precluded under ERISA § 502(a)(3). Specifically, Aetna alleges that it has the right to "pursue overpayment of funds from the benefit plans, including overpayments resulting from fraud, waste, or abuse through litigation." Compl. ¶ 338. ERISA § 502(a)(3) only allows equitable relief to address "violations" of ERISA plans or provisions. Despite its efforts to recast the claim as seeking equitable

relief, Aetna's § 502(a)(3) claim seeks relief available at law (*i.e.*, money). *Cook v. Campbell*, 482 F. Supp. 2d 1341, 1361-62 (M.D. Ala. 2007) (holding it was appropriate to dismiss a § 503(a)(3) claim on Rule 12(b)(6) motion, pointing out various other courts that have dismissed such claims at the pleading stage "on the ground that both specific and general requests for equitable relief merely were attempts to repackage legal claims as equitable ones").

### 3.   Aetna's Vague Assertions That Defendants Violated ERISA Plans Are Insufficient to State a Claim for Relief

Aetna also does not identify, with any particularity, any benefits plan or plan that prohibits the "violations" Defendants are alleged to have committed. Aetna merely alleges that Defendants "caused the overpayment of funds on behalf of ERISA-governed benefit plans in violation of the benefit plans' terms," without providing the terms from any of those plans. Compl. ¶ 341. *See Green v. Holland*, 480 F.3d 1216, 1225-26 (11th Cir. 2007) ("an ERISA violation or a Plan violation …. is a prerequisite to pursuing an action for equitable relief under . . . § 502(a)(3)"). Aetna provides several vague examples of terms under unspecified plans, and worse, no examples that assign a right to bring litigation for overpayment. Compl. ¶ 338. Vague assertions that Defendants, who are not parties to the ERISA plans, violated

undefined terms of undefined plans, fail to satisfy pleading standards for an ERISA claim under Rule 12(b)(6). *Green*, 480 F.3d at 1225-26.

### G.    Aetna is Not Entitled to a Declaratory Judgment (Count 11)

Aetna's declaratory relief count seeks nothing more than affirmation that it prevails on its other counts. As discussed herein, state law counts cannot circumvent the NSA and the relief Aetna seeks is superfluous to its other counts. "To the extent [Aetna] seek[s] a declaration about the propriety of [Defendants'] past conduct, that issue is inextricably intertwined with [Plaintiff's] substantive claims." *Cravens et al. v. Garda CL Southeast, Inc. et al.*, Case No. 24-CV-80400-RLR, 2024 WL 5058304, at *15 (S.D. Fla. Dec. 9, 2024). Thus, a declaratory judgment will serve no useful purpose, and nothing in the Complaint supports declaratory relief.[50]

## VII.    CONCLUSION

The Court should dismiss Aetna's counts as to the NSA Period.

### LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), the undersigned certifies that counsel for Defendants conferred with counsel for Plaintiffs on February 20, 2025 by videoconference, and Plaintiffs oppose the relief sought herein.

---

[50] "Under the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court has 'substantial discretion in deciding whether to declare the rights of litigants.'" *Cravens*, 2024 WL 5058304, at *15 (*citing Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).

Respectfully submitted this 25th day of February, 2025.

Glenn Solomon
*Admitted Pro Hac Vice*
Christopher Charles Jew
*Admitted Pro Hac Vice*
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: 213-443-4355
Email: gsolomon@kslaw.com
            cjew@kslaw.com

Sara Brinkmann
*Admitted Pro Hac Vice*
**KING & SPALDING LLP**
1100 Louisiana Street, Suite 4100
Houston, TX 77002-5213
Telephone: 713-751-3200
Email: sbrinkmann@kslaw.com

*/s/Samantha J. Kavanaugh*
Samantha J. Kavanaugh
Florida Bar No.: 0194662
Michael H. Thompson
Florida Bar No.: 1045189
**KING & SPALDING LLP**
Southeast Financial Center
200 S. Biscayne Blvd., Suite 4700
Miami, FL 33131
Telephone: 305-462-6000
Email: skavanaugh@kslaw.com
            mhthompson@kslaw.com

*Counsel for Defendants Radiology
Partners, Inc. and Mori, Bean, and
Brooks, Inc.*