# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| AETNA HEALTH INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>RADIOLOGY PARTNERS, INC., et al.,<br><br>*Defendants*. | CASE NO.: 3:24-CV-01343-BJD-LLL |

## DEFENDANTS' MOTION TO COMPEL ARBITRATION, MOTION TO STAY, AND INCORPORATED MEMORANDUM OF LAW

The lawsuit filed by Plaintiffs Aetna Health Inc., Aetna Life Insurance Company, and Aetna Health Insurance Company (collectively "Aetna"), has overlapping allegations covering a period when the parties were contracted (the "Contracted Period"), and a later period when the parties became subject to the federal No Surprises Act ("NSA"), 42 U.S.C. §§ 300gg-111-12 (the "NSA Period").

Pursuant to Sections 3 and 4 of the Federal Arbitration Act (the "FAA"), Defendants Mori, Bean, and Brooks, Inc. ("MBB") and Radiology Partners, Inc. ("RP"), respectfully demand arbitration against and move for an Order compelling Plaintiffs, Aetna Health Inc., Aetna Life Insurance Company, and Aetna Health Insurance Company (collectively "Aetna"), to arbitrate the claims in their Complaint (ECF No. 1) arising out of or relating to the contracted period ("the Contracted

Period") during which MBB and Aetna had a written contract (the "Contract") that contains a broad arbitration provision. Defendants have concurrently filed a motion to dismiss ("MTD") Aetna's claims relating to the NSA Period.[1]

## I.    <u>INTRODUCTION</u>

MBB is a highly respected radiology practice with a long history of serving patients, physicians, and hospitals across Florida. Patients and hospitals choose MBB's doctors for their radiology services because of their commitment to excellence and their ability to provide critical diagnoses and interventions that significantly impact patients' lives. By leveraging advanced technology and maintaining a patient-centered approach, MBB is a leader in radiology in Florida.

RP exists to transform radiology with locally led practices like MBB, innovating to deliver high-quality care.[2] Despite a national radiologist shortage and economic challenges in today's environment, RP is proud to make differential,

---

[1] Since Aetna's allegations for the later NSA Period are boot-strapped on the same core tort theories, arbitration will resolve the many common threshold issues that apply to both periods. Defendants' MTD addresses the NSA Period in fulsome fashion.

[2] RP's innovations have propelled it into a transformative national radiology practice. Its success empowers physicians to provide superior patient care and broader coverage for their patients' needs. For example, RP's Clinical Value Team develops, trains, and implements clinical best practice guidelines and supports training, peer review, and peer learning. RP has also pioneered the implementation of artificial intelligence tools in the workflow to enhance radiology services and improve clinical outcomes. Among other clinical initiatives, RP's National Patient Safety Organization collects and analyzes data to help enhance patient safety and healthcare quality. Its commitment to innovation and excellence makes RP a leader in the industry, driving positive change and setting new benchmarks for quality and efficiency in radiology.

strategic investments in leading technology, like AI in the radiology specialty, to enhance radiologist accuracy, service, and capacity nationwide.

A thriving radiology sector is crucial for American healthcare. Imaging is a diagnostic cornerstone of modern healthcare. Accurate and timely interpretations by skilled radiologists are vital, especially in emergencies. The national radiologist shortage means that high-quality diagnostic radiology increasingly relies on teleradiology, flexible staffing, and advanced technology to provide hospitals and emergency departments with 24/7/365 coverage. Achieving this requires significant investment in people, process, and technology, and networking of radiologists across the country in order to deliver timely, quality subspecialized care to patients.

Aetna is a Goliath, the world's second largest commercial health insurance company, and has a master, its owner CVS Health ("CVS"), ranked No. 6 on the Fortune 500 List. CVS, dissatisfied with Aetna's profits, has fired executives over financial performance. Aetna's solution? Prioritize profits over patient care and crush any providers who do not get in line. Aetna engineered this dispute to crush doctors. Aetna's scheme is straightforward; on information and belief, it is fraudulent and with a shameless pursuit of profits at any cost.

*Step 1*: **Aetna breaks commitments, forces groups out of network.** Aetna reneged on agreements made during COVID. MBB voluntarily reduced rates on certain procedures based on Aetna's promise to negotiate a new contract. Instead,

Aetna terminated MBB's in-network agreement in July 2022 with no cause stated. This forced MBB radiologists out of network[3] and forced MBB into the NSA dispute process when Aetna dramatically underpaid MBB. The NSA process is expensive and time-consuming, so many other physician groups do not try to pursue NSA disputes.[4] Thus, the NSA out-of-network strategy for Aetna is usually a solid bet; providers are likely to accept their underpayments without a viable path for redress. With the support of a larger organization, MBB has been able to pursue NSA arbitrations, the only path to redress under federal law. Aetna's out-of-network strategy also forces patients to face unnecessary pre-authorizations, delays, and even denials, making it difficult for them and hospitals to arrange care. For Aetna, that is not much of an inconvenience, even if the NSA awards plus fees total more than in-network rates, because Aetna passes those costs to employers paying for self-funded plans, effectively defrauding their customers by placing Aetna's interests first.

- *Step 2*: **Aetna denies, delays, and underpays claims.** Now that the doctors are out of network, Aetna systematically underpays or refuses to pay out-of-network

---

[3] Aetna knows out-of-network services, where there are not contracted rates, are costlier. For example, a jury trial transcript in Kenneth Raymond Koenig, Et Al. v. Aetna Life Insurance Company, Et Al. United States District Court for the Southern District of Texas; Case No. 04:13-cv-00359 reflects an Aetna executive explaining that "in-network… it costs everybody less because there's negotiated rates."

[4] Upon information and belief, Aetna games its shared savings plans and passes through costs to its self-funded plans. *See Kraft Heinz v. Aetna Life Ins. Co.*, 2:23-cv-00317, E.D. Tex. (ECF No. 1) (June 30, 2023).

rates, forcing doctors to submit claims for payment under the NSA. After those claims are filed, Aetna sidesteps NSA-mandated negotiations, manipulates coding to stall payment on claims, and relies on bureaucratic red tape to starve out the doctors and groups. Meanwhile, employers are still paying Aetna so-called "shared savings payments," when Aetna's strategy really costs them more in the long run as the employers pay NSA award/fee amounts far exceeding in-network rates Aetna knows the provider would accept. Aetna refuses to contract at lower rates that would save employers and patients significant dollars because doing so would eliminate the fraudulent "shared savings" payments Aetna pockets. Few, if any, employers understand this manipulation, as Aetna makes it difficult for them to get detailed information on costs, payments and fees. If Aetna genuinely wanted fewer out of network reimbursement disputes, it would contract for lower rates. But this is simply not Aetna's interest; the patients, employers, hospitals, groups and doctors are pawns to move on the board in its reckless pursuit of illegitimate profits.

*Step 3*: **Aetna dangles a new contract, but then reneges and sues.** MBB, after being forced out of network and supported by RP, successfully navigated the NSA. Aetna did not expect the NSA arbitrators to side with MBB 98% of the time. Sooner or later someone footing the bills for Aetna took notice, so Aetna dangled the prospect of a new in-network agreement and began negotiations, all the way up through an agreement on rates. Then, in late October 2024, with contracted rates

agreed to that would result in significant savings relative to the NSA, and on the cusp of signing, Aetna goes silent, and sues—two days before Christmas.

- *Step 4*: **Aetna tries to hurt the doctors' brand.** The suit needs to cause pain outside the courtroom and distract from Aetna's own motivations, so Aetna wrote a complaint designed for maximum media impact with salacious allegations of fraud and conspiracy, omitting that Aetna tried—and failed—to assert all of these same claims in a prior lengthy Texas arbitration. Aetna hopes to win the long game by scaring hospitals and doctors, tarnishing reputations, and undermining public trust. Aetna wants to make the radiology practice spend millions to send the message that, win or lose, the process is the punishment; Aetna will misuse litigation to its benefit.

Aetna knows its Contracted Period claims belong in arbitration, having itself previously filed the same failed arguments there as required by the contracts. But arbitration is private and does not send the public message. Instead, Aetna burdens the Court with a lawsuit it would never have filed if Aetna were an honest broker, not motivated by greed and a good steward of its self-insured employers' money, or even the least bit interested in its members' care. Aetna's message to hospitals, doctors and groups has been delivered: challenge us and you get to take a long, hard bogus court ride while Aetna lines its pockets with false "shared savings" and pumps up those quarterly numbers sent upstairs to CVS.

## II.    <u>**SUMMARY OF THE ARGUMENT**</u>

Aetna alleges MBB billed for services by other Florida RP-affiliated radiology practices, both before and after the Contract was terminated. For two decades, MBB was an in-network provider with Aetna through the Contract, until July 2022, when Aetna unilaterally terminated without cause. Aetna had promised a renewal in exchange for MBB previously voluntarily lowering rates by 25% on certain procedures, at Aetna's request, during the height of the COVID-19 pandemic, all while Aetna was raking in profits due to low utilization.

Aetna now tells the Court it terminated the MBB Contract because it believed MBB was billing for non-MBB radiologists. Aetna's lie is premised on the false theory that radiologists who do or did work for other medical groups, supposedly are not allowed to be also employed or contracted by MBB for services at hospitals that chose MBB to staff their radiology departments. Aetna's frivolous assertion, which is wholly inconsistent with the Contract and how modern radiology is practiced, forms the dubious basis for Aetna's various tort theories against MBB and RP, which are the same for both the Contracted Period and NSA Period. Curiously, over the past two and half years, Aetna has made zero claims against MBB and RP for overpayments, apparently choosing to suffer in silence and lie in wait, despite having argued the same thing in Texas in 2021-2022. Aetna's long-silence in Florida reflects that it knows its theory really has no merit.

### A.     <u>Contracted Period Claims Are Subject to An Arbitration Clause</u>

This Motion addresses the allegations arising out of or relating to the Contracted Period, which Aetna is required to arbitrate. Per Section 10.2.2:

> Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules").

*See* Declaration of Malea Reising ("Reising Decl."), Ex. A (the "Contract").[5]

Aetna *knows* the Contracted Period is subject to arbitration. Aetna pursued nearly identical claims in a 2021 Texas arbitration, against RP and another RP-affiliated medical group, Singleton Associates, P.A. ("SAPA") *See* RJN, Ex. 1 at 3. Moreover, Aetna insisted that RP, a non-signatory to the medical group contract was subject to arbitration under the same template arbitration provision applicable here. *See* Ex. 7 at 6-7, and *compare* Ex. A with RNJ Ex. 1, fn. 1, Ex. 5 at 1.

The Texas arbitration included ***Aetna arbitrating*** all counts against ***RP and SAPA*** for the same torts alleged here—i.e., fraud, tortious interference, fraudulent inducement, negligent misrepresentation, money had and received, and unjust enrichment. *Id.*, *see also* RJN Ex. 3 at 6-7. The parties engaged in extensive discovery, motion practice, briefing, and weeks of hearings over multiple phases and

---

[5] Aetna's obligation to arbitrate is not terminated with the Contract. Ex. A, § 11.4.

years. Declaration of Christopher C. Jew ("Jew Decl.") ¶ 8; *see also* RJN Ex. 3 at 1-8. Ultimately, the same tort theories Aetna advances here were completely rejected, in lengthy federal court-style orders addressing the plethora of Aetna's theories. *Id.* 2 at 31-42; Ex. 3 at 26-31. Now, Aetna comes to the Court hoping to evade another arbitration. Make no mistake, Aetna fully understands the application of the arbitration provision. Aetna is clearly using the federal court as its public relations platform to make private arbitration claims public and point the finger at others without being subjected to claims of defamation.

### B.    Aetna's Bogus Tort Allegations Failed In Texas

Aetna knows that its tort claims against MBB and RP are wrong, and worse, intentionally misstate the truth. Aetna's strained tort theories were examined at length and all categorically rejected in the Texas arbitration. The Texas arbitrator told Aetna plainly:

> [W]hen SAPA had the exclusive hospital agreement, SAPA was the entity that had the obligation to provide radiologists to the hospital's radiology department. **SAPA could fulfill this obligation by using** its own employees or **contractors or by using radiologists provided by staffing companies such as locum tenens companies or [redacted], or by using radiologists provided by other groups or entities**. When SAPA used radiologists provided by other groups or entities, **SAPA was providing the services**, but it was fulfilling its obligation using radiologists provided by another group or entity. In the case of [redacted], for example, [redacted] did not provide the radiology services at the hospital where SAPA had the exclusive agreements. Rather, SAPA provided the radiologists to staff the department using radiologists obtained from [redacted], pursuant to its independent contractor agreement between SAPA and [redacted].

RJN Ex. 3 at 36 (emphasis added). Florida law is the same as Texas.[6] Moreover, Aetna updated its template radiology group contracts years ago to expressly reflect that physician groups **can and do** provide services using both employed and contracted physicians. *Id.* Aetna's lawsuit lacks legitimate purpose outside of lawfare, having deliberately sidestepped proper channels. These Contracted Period claims belong in arbitration; Aetna came to the Court to forum-shop the same dispute it lost a few hours west down I-10 and to send a public message. The Court need not countenance Aetna's strategy.

## III.    **BACKGROUND**

### A.    **Procedural History Before this Lawsuit**

Since May 2021, the parties and their affiliates have been engaged in dispute resolution in various forums. Initially, SAPA filed arbitration against Aetna for underpayments during the pandemic. RJN Ex. 3 at 29. The arbitrator agreed Aetna breached the contract by failing to pay the agreed reimbursement rate. *Id.* at 29-30.

Aetna Life Insurance Company, one of the Aetna plaintiffs in this lawsuit, and another Aetna affiliate, responded to SAPA's claims in 2021, with counterclaims parallel to those now asserted in this lawsuit. RNJ Ex. 1 at 1, *see also* Ex. 3 at 6-7.

---

[6] *E.g.*, *J. Sternberg, S. Schulman & Assocs., M.D., P.A. v. Hosp. Corp. of Am.*, 571 So. 2d 1334, 1335 (Fla. 4th DCA 1989) (affirming denial of a temporary injunction to permit radiologists to continue to practice at a hospital after that hospital entered exclusive staffing contract with another radiology group).

Just as here, Aetna was represented by Robins Kaplan, including Aetna's former in-house head of provider litigation. Jew Decl. ¶ 6. Next, in January 2022, Aetna requested leave from the arbitrator to file claims against RP and two other RP affiliates. *See* RJN, Ex. 1 at p. 5, ¶ 12; Ex. 7 at 6-7. Aetna asserted that these three RP non-signatories were bound to the arbitration agreement pursuant to direct-benefits estoppel doctrine. *Id.* From that day forward, Aetna spent the bulk of the arbitration arguing that RP and the other non-signatories were liable for all the alleged counts—just like here.

On May 4, 2023, after extensive discovery, briefing, argument and a three-week evidentiary hearing, the Texas arbitrator issued a 45-page order. RJN, Ex. 3. Among other things, the arbitration order (a) rejected all of Aetna's direct allegations against the RP entities, (b) rejected all of Aetna's tort allegations, (c) found Aetna breached the SAPA agreement by changing its systems not to pay the contracted rate to employed doctors, and (d) found SAPA, but not the RP entities, breached the agreement by failing to obtain preapproval for its use of doctors who were subcontractors (except for *locums tenens* radiologists). *Id.* at 29-30, 44-45. Notably, the Texas arbitrator also found that Singleton properly enrolled the subject providers with Aetna's ordinary procedures for adding providers to its contracts. *Id.* at 17-19.

On July 3, 2024, following even more extensive discovery, briefing, and over a week of additional evidentiary hearings, the Texas arbitrator issued a 31-page order

on Phase Two, which among other things, (a) rejected Aetna's alter ego allegations against the RP entities, (b) quantified damages for the respective breaches by Aetna and SAPA, and (c) directed that future phases would address attorneys' fees, interest, costs, and other remaining issues. RJN, Ex. 4 at 2, 30-31.

Aetna filed a premature petition to confirm the minority portion of the prior orders, for the one partial contract breach it won. RJN, Ex. 1. SAPA opposed Aetna's premature application, pointing out that Aetna redacted large sections of the orders showing everything Aetna lost, and that remaining phases would eradicate or reduce what Aetna sought to confirm. RJN, Ex. 2 at p. 5, fn. 4 and 18-23. For example, SAPA had additional, still pending, underpayment claims and a claim for attorneys' fees for prevailing on its breach of contract claim, whereas Texas law did not provide Aetna a parallel right to such fees under the circumstances. *Id.* at 2, 8, 18-21.

In September 2024, the parties settled. Jew Decl., ¶ 8. But settlement cannot erase Aetna's judicially noticeable actual knowledge, since at least 2021-2022, that RP-affiliated groups: (a) use contractors as well as employees to deliver services under hospital staffing contracts (particularly in times of severe physician shortage), and (b) all the other evidence from the Texas arbitration that undercuts Aetna's good faith in filing this bogus copycat lawsuit.

As the concurrently filed MTD explains, Aetna also seeks to use its failed tort arguments to collaterally challenge its many losses in the NSA Period; and the parts

of the lawsuit addressing the NSA Period should be dismissed outright. But if not, they should be stayed pending the outcome of arbitration.

### B.    All Alleged Counts Involve the Arbitrable Contracted Period

Aetna's allegations against MBB and RP, including the allegation that they submitted bills for radiology supposedly provided by another Florida RP-affiliated radiology group, span the Contracted Period. Every count of the Complaint also expressly incorporates paragraphs 1 through 118 and 189 through 209. These sections repeatedly rely on the Contract—which Aetna calls the In-Network Agreement. *See* Compl. at ¶¶ 59,[7] and 49, 54, 76, 93, 105, 118.

## IV.    THE COURT SHOULD COMPEL AETNA TO ARBITRATE

Both MBB and RP have the right to compel Aetna to arbitrate the allegations arising out of or related to the Contracted Period pursuant to the Arbitration Provision in the Contract and applicable law:

### A.    FAA Arbitration is Favored Over Court Litigation

The Contract expressly references the FAA. Reising Decl., Ex. A, § 10.2.2. The FAA favors arbitration over court litigation. *Seaboard Coast Line RR. Co. v. Trailer Train Co.*, 690 F.2d 1343, 1348 (11th Cir. 1982). "This federal policy requires that [the court] construe arbitration clauses generously, resolving all doubts

---

[7] Alleging: "Because MBB's In-Network Agreement was relatively lucrative, Radiology Partners decided to bill services rendered by its *other* Florida-based radiology groups though MBB…".

in favor of arbitration." *Id.; accord Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

### B.  MBB Can Compel Aetna to Arbitration

Courts engage in a two-step inquiry in analyzing a motion to compel arbitration by a signatory: first it must determine whether the parties agreed to arbitrate the dispute; and then, it decides whether "legal constraints external to the parties' agreement foreclosed arbitration." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). Whether a contract's arbitration clause requires arbitration of a given dispute is a matter of contract interpretation. *Seaboard Coast Line R. Co.*, 690 F.2d at 1348. The validity of an arbitration agreement is a matter of state law. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367-68 (11th Cir. 2005). Florida courts consider three elements: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived. *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999). These elements are satisfied here.

First, Aetna repeatedly pled the existence of the Contract. *See* Compl., ¶¶ 49, 54, 59, 76, 93, 105, 118. Second, the Contract requires arbitration of "Any controversy or claim **arising out of or relating to** this Agreement or the breach, termination, or validity thereof." Reising Decl., Ex. A, §10.2.2. (emphasis added).

14

Florida law considers arbitration provisions using this language to be broad. *See Seifert*, 750 So. 2d at 637. The Florida Supreme Court set forth the framework for determining whether a claim falls within this sort of broad arbitration provision:

> The addition of the words "relating to" broadens the scope of an arbitration provision to include those claims that are described as having a "significant relationship" to the contract—regardless of whether the claim is founded in tort or contract law. A "significant relationship" between a claim and an arbitration provision does not necessarily exist merely because the parties in the dispute have a contractual relationship. Rather, a significant relationship is described to exist between an arbitration provision and a claim if there is a "contractual nexus" between the claim and the contract. A contractual nexus exists between a claim and a contract if the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract. More specifically, a claim has a nexus to a contract and arises from the terms of the contract if it emanates from an inimitable duty created by the parties' unique contractual relationship.

*Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) (citations omitted.) The Contract also expressly lists the arbitration provision as surviving its termination. Reising Decl., Ex. A, § 11.4.

Courts readily find that torts like those Aetna asserted here against MBB are arbitrable under the broad arbitration provision contained in the Complaint. *E.g.*, *Jackson*, 108 So. 3d at 594 (fraud arbitrable under broad arbitration provision because "(1) the fraud claim is inextricably intertwined with both the circumstances that surrounded the transaction from which the contract emanated and the contract itself; and (2) resolution of the fraud claim requires the construction and consideration of duties arising under the contract[,]"); *Walsh Grp. v. Zion*

15

*Jacksonville, LLC*, 379 So. 3d 571 (Fla. 5th DCA 2024), *review denied sub nom. Zion Jacksonville, LLC v. Walsh Grp. d/b/a Archer W. Contractors, LLC*, No. SC2024-0329, 2024 WL 3335573 (Fla. July 9, 2024) (fraud and gross negligence were "inextricably intertwined" with contract, and thus subject to broad arbitration clause; pervasive theme was alleging defendant's conduct differed from what contract permitted); *Fla. Woman Care LLC v. Nguyen*, 329 So. 3d 146, 149 (Fla. 4th DCA 2021) (non-signatory manager of corporate signatory could compel arbitration of tortious interference with contractual relationship claim, which relied on the terms of the contract containing an arbitration clause).

Here, Aetna's Complaint contains a pervasive theme of alleging MBB billed for non-MBB providers in violation of the Contract. These allegations run through all the counts for the Contracted Period. Resolving these allegations will require addressing the rights, obligations, terms, and conditions of the Contract. Aetna's allegations relating to the Contracted Period cannot be divorced from the Contract.

Finally, MBB has timely demanded arbitration as its initial response to Aetna's Complaint and has not waived its right to arbitrate. *See Concrete Design Structures, Inc. v. P.L. Dodge Found., Inc.*, 532 So.2d 1334, 1334-35 (Fla. 3d DCA 1988) (filing a counterclaim and motion to dismiss simultaneously with a motion to compel arbitration, *without more,* does not waive the contractual right to arbitrate).

### C.    **RP Can Compel Aetna to Arbitration**

RP also can compel arbitration against Aetna under the Contract. State law governs whether an arbitration clause is enforceable by a non-signatory under the FAA. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). A non-signatory defendant can enforce an arbitration clause against a signatory plaintiff pursuant to any of the following doctrines: 1) equitable estoppel; 2) agency; and/or 3) judicial estoppel. Each are sufficient to compel arbitration; all are satisfied here.

### 1.    **Equitable Estoppel**

Equitable estoppel precludes a party from "trying to have his cake and eat it too, that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage by requiring arbitration." *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002) (cleaned up). Equitable estoppel allows non-signatories to enforce an arbitration provision against a signatory under **either** of two circumstances: (1) when the contract signatory relies on the contract for his or her allegations; *see Armas v. Prudential Sec., Inc.*, 842 So. 2d 210, 212 (Fla. 3d DCA 2003); or (2) when the contract signatory alleged concerted misconduct by a non-signatory and another contract signatory. *See Bailey v. ERG Enter.*, 705 F.3d 1311, 1321 (11th Cir. 2013); *Marcus v. Fla. Bagels, LLC*, 112 So. 3d 631, 633-34 (Fla. 4th DCA 2013). Both apply here.

### a.    Aetna Relies on the Contract for Allegations Against RP

First, equitable estoppel applies when a contract signatory references or presumes a contract to assert counts against a non-signatory. *Armas*, 842 So.2d at 212 ("Equitable estoppel is also warranted when each of the signatory's claims against a non-signatory make reference to or presume the existence of a written agreement."). Aetna does this multiple times.

Every count of Aetna's Complaint incorporates by reference paragraphs 1-118 and 189-209. A recurring theme in those paragraphs is that, when Aetna and MBB were in-network pursuant to the Contract, "Radiology Partners decided to bill services rendered by its *other* Florida-based radiology groups though MBB." *See* Compl. at ¶59 (referencing the purportedly lucrative nature of the Contract); ¶¶49, 54, 76, 93, 105, 118 (all referencing reimbursement pursuant to the Contract, which allegedly led Aetna to become suspicious of MBB's growth and terminate).

Aetna's counts also expressly reference that Aetna paid MBB under the Contract until June 30, 2022, but argues that the Contract did not permit those payments and that MBB's billing under the Contract was tortious. Thus, Aetna's allegations rely upon and are necessarily related to the Contract. *See Koechli v. BIP Intern., Inc.*, 870 So. 2d 940, 945 (Fla. 1st DCA 2004) ("Because the basis of [plaintiff's] claims arise out of or are intimately related to the [] agreement, it would

be inequitable to allow [plaintiff] both to rely upon the agreement in its action against non-signatories and selectively repudiate it when seeking to resist arbitration.").

Count One of the Complaint, which alleges tortious interference by RP with the Contract, is particularly telling. That count will require Aetna to prove that MBB breached the Contract. *See Gerber v. Keyes Co.*, 443 So. 2d 199, 200-01 (Fla. 3d DCA 1983) (holding that no cause of action for tortious interference existed where the contract was never breached). Aetna identifies multiple provisions of the Contract that it alleges RP caused MBB to breach. This is a classic example of when non-signatories can compel arbitration.[8]

### b.    The "Concerted Misconduct" Prong is Satisfied Too

Second, equitable estoppel applies when a contract signatory alleges "concerted misconduct" by the non-signatory and a contract signatory. *See Bailey*, 705 F.3d at 1321; *Marcus*, 112 So. 3d at 633-34. Aetna repeatedly alleges concerted misconduct by MBB and RP. According to Aetna, MBB and RP are co-conspirators to submit bills for radiology services supposedly rendered by other RP-affiliated groups. *See*, *e.g.*, Compl. ¶¶ 4, 59.[9] These allegations are sufficient to establish

---

[8] The MTD also addresses Aetna's bad faith in alleging interference by RP, as Aetna alleges that RP is MBB's alter ego, owner, controller, and manager, which makes the interference count impermissible by law. *See* Compl. ¶¶ 25, 48, 51, 63, 219, 230.

[9] Alleging that "Radiology Partners…began using MBB's name and Tax Identification Number ("TIN") to bill for services performed by *all* its "affiliated" Florida radiology groups…" and "Because MBB's In-Network Agreement was relatively lucrative, Radiology Partners decided to bill services rendered by its *other* Florida-based radiology groups though MBB, making it appear

alleged concerted conduct for equitable estoppel. *See Kolsky v. Jackson Square, LLC*, 28 So. 3d 965, 969 (Fla. 3d DCA 2010) (holding non-signatories can compel arbitration where plaintiff alleged conspiracy and other claims arose from allegations of concerted misconduct); *Lash & Goldberg LLP v. Clarke*, 88 So. 3d 426, 427-28 (Fla. 4th DCA 2012) (estopping plaintiff from refusing to arbitrate counts against non-signatories where plaintiff alleged they engaged in conspiracy to defraud the plaintiff).

If Aetna could avoid arbitration altogether simply by naming RP and MBB together in this lawsuit, "the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (alteration in original) (quotation omitted). Equitable estoppel prevents Aetna from avoiding arbitration this way.

## 2.    <u>Agency</u>

Aetna alleges that RP acquired MBB in 2018, and RP is a "billing" or "management" company for its affiliated medical groups that "had and continues to have complete control over the operations of [MBB and other medical groups], provides full financial and management support …." Compl. ¶¶48, 51. Aetna also alleges that RP submitted bills for MBB to receive reimbursement and acts "on

---

as though MBB rendered the services…".

behalf" of MBB in initiating NSA disputes. *Id.*, *e.g.*, ¶¶ 4, 64, 332, 352, 354b. This is a type of agency relationship. *See Mims v. Glob. Credit & Collection Corp.*, 803 F. Supp. 2d 1349, 1355 (S.D. Fla. 2011) ("In fact the very definition of an agent is '[o]ne who is authorized to act for or in place of another; a representative.'" (citing BLACK'S LAW DICTIONARY (9th ed. 2009)). Thus, Aetna's own allegations are sufficient to establish agency for purposes of RP compelling arbitration.

Aetna also relied on agency to compel arbitration against RP for the similar allegations against RP in Texas. *See* RJN Ex. 7 at 6 (Aetna argued RP affiliates were bound to arbitrate "regardless of whether they signed the Agreement" because: "Ordinary principles of contract and agency law may be called upon to bind a nonsignatory to an agreement whose terms have not clearly done so.") (*citing Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003). This further shows that Aetna considers the types of relationships alleged here binding on non-signatories.

RP does not dispute that it is MBB's agent. In fact, it is undisputed that RP's subsidiary, Radiology Partners Management, LLC ("RP Management"), is the "sole and exclusive **agent** for the management of the day-to-day business" of MBB pursuant to a management services agreement with MBB. Reising Decl., ¶ 6. In turn, RP is RP Management's agent, and sole member, "authorized and empowered on behalf and in the name of [RP Management] to perform all acts and engage in all

activities and transactions… on behalf of [RP Management]." *Id.*, ¶ 7(a). This makes RP a sub-agent of MBB, which by law also makes RP one of MBB's agents. *United States v. Tianello*, 860 F. Supp. 1521, 1524 (M.D. Fla. 1994) ("A subagent is the agent of both the appointing agent and the principal.").

A plaintiff cannot avoid arbitration by suing an agent of a contracting party for alleged actions the agent took on the principal's behalf. *Tenet Healthcare Corp. v. Maharaj*, 787 So. 2d 241, 243 (Fla. 4th DCA 2001) (non-signatory agents may compel arbitration); *Heller v. Blue Aerospace, LLC*, 112 So. 3d 635, 637 (Fla. 4th DCA 2013) (compelling a party to arbitration who "inconsistently seeks to arbitrate its claims against the arbitration agreement signatory *principal*, and litigate in court its claims against the non-signatory *agent*, on essentially the same allegations and operative facts").

Here, Aetna's allegations against RP relate to RP's status as MBB's agent. In fact, Aetna's theme is that MBB, through RP, submitted the challenged bills. The MSA between MBB and RP Management provides for RP to do billing on behalf of MBB. The agency doctrine precludes Aetna from characterizing its claims against the agent as beyond the contractually required arbitration forum.

### 3.    **Judicial Estoppel**

Aetna successfully arguing RP had to arbitrate in Texas on parallel torts should judicially estop Aetna from avoiding arbitration against RP here.

Judicial estoppel precludes a party from successfully using an argument in one forum and then arguing the opposite in another forum. *United States v. Munoz*, 112 F.4th 923, 934 (11th Cir. 2024). Where the party seeking to apply judicial estoppel was a party to the prior action, as RP was, the factors include:

> ***First***, the party's two positions must be clearly inconsistent. ***Second***, the party must have succeeded in persuading a court to accept its earlier position. And ***third***, the party must derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Munoz*, 112 F.4th at 935 (internal citations omitted). Aetna opposing arbitration here meets the first condition.  The second should be deemed met because Aetna succeeded in its motion to get RP into the Texas arbitration – which forum the FAA endorses as a court alternative. The third factor is met because Aetna would derive an unfair advantage if permitted to force into court what it insisted elsewhere had to be arbitrated.

## V.    ALL ARBITRABLE PORTIONS OF EACH COUNT IN THE COMPLAINT SHOULD BE STAYED PENDING ARBITRATION

Pursuant to Section 3 of the FAA, the court here must stay all arbitrable portions of all the counts pending the outcome of the arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024) (finding that when a federal court finds that a dispute is subject to arbitration, and a party has requested a stay, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration).

## VI.    ANY NON-ARBITRABLE PORTIONS OF EACH COUNT, IF NOT DISMISSED, SHOULD BE STAYED PENDING ARBITRATION

Any non-arbitrable parts, if not dismissed pursuant to the concurrently filed Motion to Dismiss, also should be stayed. Aetna's allegations about MBB's right to bill overlap both the Contracted Period and later NSA Period. Therefore, the Court can and will almost certainly save limited judicial resources by letting these overlapping issues of law and fact be addressed first in the arbitration.

The arbitration outcome for the Contracted Period easily could have a preclusive effect on Aetna's allegations for the NSA Period. For example, to vacate the NSA awards, Aetna must prove it could not have discovered the alleged fraud prior to the IDRE arbitrations occurring. An AAA arbitration award finding Aetna knew or could have known during the Contracted Period what it alleges not to have known would defeat the later parallel allegations. Similarly, the AAA arbitrators easily could issue findings like the ones in Texas rejecting all of Aetna's parallel tort theories that would equally apply to the NSA Period.

Conversely, failing to stay anything that survives the MTD would result in duplicative judicial efforts and risk inconsistent outcomes in different forums. MBB and RP will present much of the same evidence for both time periods showing that services MBB billed at hospitals it staffs are MBB's services; and Aetna will present the same contrary arguments. Aetna's tort allegations traverse both earlier and later time periods; addressing the earlier period also makes chronological sense.

## VII.  **CONCLUSION**

The Court should (1) compel arbitration and stay all allegations arising out of or relating to the Contracted Period, and (2) stay anything else not dismissed.

### **LOCAL RULE 3.01(g) CERTIFICATION**

Pursuant to Local Rule 3.01(g), the undersigned certifies that counsel for Defendants conferred with counsel for Plaintiffs on February 20, 2025 by videoconference, and Plaintiffs oppose the relief sought herein.

Respectfully submitted this 25th day of February, 2025.

Glenn Solomon
*Admitted Pro Hac Vice*
Christopher Charles Jew
*Admitted Pro Hac Vice*
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: 213-443-4355
Facsimile:  213-443-4310
Email: gsolomon@kslaw.com
       cjew@kslaw.com

Sara Brinkmann
*Admitted Pro Hac Vice*
**KING & SPALDING LLP**
1100 Louisiana Street, Suite 4100
Houston, TX 77002-5213
Telephone: 713-751-3200
Facsimile:  713-751-3290
Email: sbrinkmann@kslaw.com

/s/Samantha J. Kavanaugh
Samantha J. Kavanaugh
Florida Bar No.: 0194662
Michael H. Thompson
Florida Bar No.: 1045189
**KING & SPALDING LLP**
Southeast Financial Center
200 S. Biscayne Blvd., Suite 4700
Miami, FL 33131
Telephone: 305-462-6000
Facsimile:  305-462-6100
Email: skavanaugh@kslaw.com
       mhthompson@kslaw.com

*Counsel for Defendants Radiology Partners, Inc. and Mori, Bean, and Brooks, Inc.*