United States District Court
Middle District of Florida
Jacksonville Division

**AETNA HEALTH INC., ET AL.,**

    **Plaintiffs,**

**v.**                                                           **NO. 3:24-CV-1343-BJD-LLL**

**RADIOLOGY PARTNERS, INC., ET AL.,**

    **Defendants.**

_____

## Report and Recommendation

Before the Court are Defendants' Motion to Dismiss and Memorandum of Law, doc. 27; Defendants' Motion to Compel Arbitration, Motion to Stay, and Incorporated Memorandum of Law, doc. 28; the corresponding responses in opposition, docs. 47, 48; and defendants' reply to the response in opposition to the motion to compel arbitration, doc. 52. Defendants' motions, docs. 27, 28, have been referred to me for issuance of a report and recommendation regarding the appropriate resolution. For the reasons discussed below, I respectfully recommend that the complaint be stricken and plaintiffs be directed to amend their complaint; and defendants' motion to dismiss, doc. 27 and defendants' motion to compel arbitration, doc. 28, be denied as moot.

## Background

This case is about benefit payments made by an insurance company to providers of radiology services. Plaintiffs, Aetna Health, Inc.; Aetna Life Insurance Company; and Aetna Health Insurance Company (collectively Aetna) are a managed care company that provide health care services to their members. Doc. 1 ¶ 27. Defendant Radiology Partners (RP)[1] is a private-equity-backed company that aggregates radiological groups throughout the country. *Id.* ¶ 37. Defendant Mori, Bean and Brooks, Inc. (MBB) is a radiology group based in Jacksonville, Florida that was acquired by RP in 2018. *Id.* ¶¶ 46, 48.

Since its formation, RP has acquired and consolidated at least nine radiological groups (RP affiliates) in Florida. *Id.* ¶ 3. After acquisition, RP maintains control over the operations of the RP affiliates, providing administrative, clerical, accounting, financial, and management support. *Id.* ¶¶ 2, 51-52. All RP affiliates either currently maintain or had an in-network contractual agreement with Aetna at the time of their acquisition. *Id.* ¶ 3. Under these contracts, which are individually negotiated,[2] each RP affiliate agrees to bill Aetna under their distinct Tax Identification Number (TIN) for medical services provided. *See id.* ¶ 4

---

[1] Aetna alleges that RP earns "$3 billion [dollars] in annual revenue, employs more than 3,900 radiologists at 3,400 sites in all 50 states, and handles more than 10% of the country's imaging volume." Doc. 1 ¶ 38.

[2] Aetna does not allege the specifics of the fee structure of its in-network agreements with the RP affiliates.

The relationship between MBB, RP, and Aetna operated in the following manner: MBB provided medical services to Aetna members, which were then billed to Aetna by RP under MBB's name and TIN. *Id.* MBB was then reimbursed in one of two ways for the services it provided. For services enumerated on a previously negotiated fee schedule that was attached to the contract, MBB would be paid a fixed fee. *See id.* ¶ 54. For services not enumerated on the fee schedule, MBB would be paid a "default rate" of 70% of MBB's charges. *Id.* These charges consisted of rates set by MBB. *See id.* ¶¶ 55-56. MBB maintained its contract with Aetna for almost 4 years—from the time it was acquired by RP in September 2018, until the contract was terminated in July 2022 (also referred to as the "contract period"). *Id.* ¶ 130.

In the complaint, Aetna alleges a fraudulent billing scheme enacted by RP and MBB. *See generally* doc. 1. After it was acquired by RP, and during the contract period, MBB artificially raised the rates it charged for unenumerated medical services provided to Aetna's members.[3] *Id.* ¶¶ 55-56. This was so it could receive a higher pay out under the 70% default rate. *See id.* RP then—further exploiting MBB's inflated rates and higher payout under the 70% default rate—began fraudulently billing Aetna under MBB's name and TIN for medical services provided by other RP affiliates, who did not have contracts with such favorable rates. *Id.* ¶¶ 58-66, 76, 93, 105. Aetna alleges

---

[3] For example, Aetna alleges that "prior to [RP], MBB charged Aetna $41 for a read of a particular x-ray. In turn, Aetna would reimburse $28.70 (i.e., 70% of $41). After [RP]'s acquisition of MBB, MBB began charging as much as $147 for the same service. MBB was then paid $102.90 by Aetna—a 258% increase. . . ." Doc. 1 ¶ 56.

3

that as a result of the scheme, they wrongfully paid out more than 20 million dollars to defendants. *Id.* ¶ 111.

MBB's contract with Aetna was terminated in July 2022. *Id.* ¶ 130. Thus, any billing for services that took place after July 2022 was during the "post-contract period." At that time, MBB became an out-of-network provider for Aetna policy holders. *Id.* ¶ 6. As an out-of-network provider, claims submitted by MBB for medical services it provided to Aetna's members were subject to the No Surprise Act (the Act), 42 U.S.C. §§ 300gg-111, and the Act's independent resolution process (resolution process). *Id.* ¶ 8. The Act's resolution process acts as a mechanism for out-of-network providers (such as MBB) and health insurers (such as Aetna) to resolve payment disputes for medical services rendered by the out-of-network providers. *Id.* ¶¶ 121-22. The Act and its resolution processes do not apply to in-network providers. *Id.* ¶ 8.

Aetna also alleges that RP continued to engage in fraudulent billing practices during the post-contract period, specifically by using MBB's name and TIN for medical services provided by the RP affiliates, despite those affiliates being in-network with Aetna. *Id.* ¶¶ 8-9, 119, 130-34. RP then initiated thousands of resolution processes against Aetna disputing denials of the out-of-network payments made for services rendered by MBB and the RP affiliates. *See id.* ¶¶ 130-87. Aetna also contends that a significant number of the claims submitted by MBB resulted in favorable outcomes, with MBB and RP being awarded disputed costs for the medical services that were provided. *Id.* ¶ 178; doc. 1-1. In sum, the complaint alleges that numerous claims were fraudulently initiated through the Act's resolution process by RP because the providers

4

that actually performed the services were in-network with Aetna—and not subject to the Act.

Aetna has filed an eleven-count complaint against defendants alleging two causes of action against RP (counts one and two);[4] eight claims against both RP and MBB (counts three through eight, ten and eleven); and one claim against MBB alone (count nine). *See* doc. 1. at 43-68. Defendants have responded by contemporaneously filing a motion to dismiss and a motion to compel arbitration; Aetna responded in opposition. Docs. 27-28, 47-48.

## Authority

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has explained this requires that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

---

[4] Based on the representations made in their briefing, both parties agree that counts one and two—asserted only against RP—allege tortious interference with Aetna's contracts during the contract period. *See* docs. 27; 28; 47 at 5; 48 at 7. Notwithstanding, the Court notes that Aetna's response in opposition to the motion to dismiss takes inconsistent positions regarding whether count two concerns conduct during the contract or post-contract period, at times claiming both. *See* doc. 47 at 5, 12.

In deciding a Rule 12(b)(6) motion, a district court should construe the complaint broadly and view the allegations in the light most favorable to the plaintiff. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir.1999)). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal citation and quotation omitted).

Rule 10(b) further requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Rule 10(b) also provides that "[i]f doing so *would promote clarity*, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." *Id.* (emphasis added). Rules 8 and 10:

> work together to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

*Fikes v. City of Daphne,* 79 F.3d 1079, 1082 (11th Cir. 1996) (quoting *T.D.S. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520, 1543 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting)). "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings and "exact an intolerable toll on the trial

court's docket, lead to unnecessary and unchanneled discovery, and impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and resources." *Cramer v. State of Fla.*, 117 F.3d 1258, 1263 (11th Cir. 1997). The Eleventh Circuit has opined that all shotgun pleadings share one unifying characteristic, "they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.

## Discussion

In response to Aetna's lawsuit, defendants filed motions to dismiss and to compel arbitration, docs. 27, 28. Defendants argue that all eleven causes of action—as pled—allege misconduct that occurred during both the contract and the post-contract period. Docs. 27 at 1, 24; 28. This is significant, according to defendants, because any alleged fraud that occurred during the contract period would be subject to the arbitration clause that governed MBB's and Aetna's contract, and the parties should be compelled to arbitration to resolve those claims. *See* doc. 27 at 1; *see generally* doc. 28. The arbitration clause reads, in relevant part:

> Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules").

Doc. 28 at 8.

Defendants also separately move to dismiss the portion of each cause of action that encompasses the post-contract period for failure to state a claim. *Id.* at 24; doc. 27. Defendants essentially request that the Court somehow bifurcate each cause of action—compelling to arbitration the portion of each count that alleges misconduct during the contract period and dismissing the portion of each count that alleges misconduct during the post-contract period. *See* doc. 28.

Aetna responds in various ways, most notably by asserting that it "has not asserted claims [ ] during the [c]ontract [p]eriod, . . ." and therefore arbitration cannot be compelled at all. Doc. 48 at 7.[5] Aetna represents that each cause of action is alleged during the post-contract period and falls into one of two categories: 1) the benefit claims paid to MBB [and by extension RP] while they were out-of-network (counts two-eight, ten-eleven); and 2) fraudulently obtained resolution process awards brought under the Act (count nine)—all of which occurred in the post-contract period. Doc. 47 at 5.

Upon review of the pleading, as well as the pending motions, the Court finds that the ambiguity around the relevant time period, as well as the terms and signatories

---

[5] This argument is, in part, premised on its position that only MBB was a signatory to the contract with Aetna, and thus arbitration is mandatory as to claims made by MBB during the contract period, but not for RP because they were not a signatory to the contract. *See generally* doc. 48. Defendants argue, however that both MBB and RP were in a contractual relationship with Aetna, and thus arbitration should be compelled as to both defendants. *See generally* doc. 28. The Court makes no findings with regards to the parties' respective positions as to this issue at this time and will consider them at a later time if raised in subsequent filings.

to the underlying contract, makes this an impermissible shotgun pleading.[6] One significant trait of every shotgun pleading is its failure "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. As explained above, the core deficiency of Aetna's complaint is its lack of notice as to the relevant time period for each count—and whether they are alleging claims for conduct against each defendant that occurred during the contractual period (September 2018-July 2022), post-contractual period (July 2022-present), or both. The relief sought by defendants is dependent upon when the alleged fraudulent conduct occurred. Without sufficient notice of the time period being alleged in each count, defendants cannot clearly respond to the causes of action against them—including arguing whether arbitration or dismissal would be the appropriate remedy. This failure, in essence, renders the complaint a shotgun pleading under Eleventh Circuit precedent. *See id.*; *see also Cramer*, 117 F.3d at 1263 (admonishing district court's for not striking shotgun pleadings sua sponte) (collecting cases).

The lack of clarity regarding the relevant time period persists throughout the complaint. For instance, counts three through eight and ten through eleven incorporates the factual allegations in paragraphs 1-209. *see* doc. 1 ¶¶ 253, 266, 282, 290, 298, 307, 334, 348. Despite Aetna's assertion to the contrary, a review of, these

---

[6] There are several categories of shotgun pleadings. Plaintiffs' complaint alleges multiple counts but incorporates all of the factual allegations (paragraphs 1-208) into each of the counts. *See Weiland*, 792 F.3d at 1321-23 (articulating the various types of shotgun pleadings).

9

allegations indicate that they relate to improper billing by RP and its affiliates *during both* the contract and post-contract period. *Id.* ¶ 4 ("In phase one of the scheme, [RP] identified MBB as having the most lucrative *in-network* contracts with commercial payors in Florida . . . and began using MBB's name and [TIN] to bill for services performed by all its 'affiliated' Florida radiology groups."); *id.* ¶ 59 ("Because MBB's *In-Network Agreement* was relatively lucrative, [RP] decided to bill services rendered by its other Florida-based radiology groups th[r]ough MBB . . . ."); *id.* ¶ 9 (alleging that "[r]ather than properly bill the services provided by [RP's] other radiology practices through those groups' existing contracts with Aetna, the Defendants continued to bill all services through MBB, using MBB's TIN" *even after MBB's agreement was terminated*.); *id.* ¶ 119 ("*After the termination of MBB's In-Network Agreement*, Defendants pivoted to the second phase of their scheme: billing for services rendered by non-MBB providers through MBB's TIN on an *out-of-network basis*."); *id.* ¶¶ 132-33. (alleging that "claims rendered by [RP affiliates] should have been submitted under their own TINs on an *in-network basis*" but "[i]nstead, [RP] directed those claims be fraudulently billed on an *out-of-network* basis under MBB's TIN.") (emphasis added throughout).

    This ambiguity is further exacerbated by the allegations individually pled under each cause of action. As noted above, each count incorporates the factual allegations in paragraphs 1–209—allegations relating to an improper billing scheme during both the contract and post-contract periods—but Aetna also pleads additional allegations specific to each count. These additional allegations are similarly ambiguous as to the

10

relevant time period because they allege misconduct that Aetna claims occurred during both the contract and post-contract period.

For instance, count three alleges:

> Each time MBB and Radiology Partners submitted a claim or caused a claim to be submitted they represented that MBB performed the services being billed and, thus, MBB was entitled to reimbursement for those services;

Doc. 1 ¶ 255.

Count four alleges:

> MBB and Radiology Partners also acted under a regime of concealment and misdirection to keep Aetna from discovering the truth about the massive pass-through billing scheme that they were implementing. As described above, they specifically concealed that MBB had been acquired by Radiology Partners and that MBB was now billing for medical services rendered by other medical groups

*Id.* ¶ 274.

Count five alleges

> Each of the co-conspirators played an integral role in carrying out this billing scheme:
>
> c. MBB maintained the In-Network Agreement with Aetna, submitted the claims for reimbursement to Aetna, and reimbursements to which it was not entitled.
>
> d. The other medical groups controlled and owned by Radiology Partners in Florida allowed services provided by their physicians to be billed under MBB's TIN so that the scheme could realize increased volumes.

*Id.* ¶ 284.

Count six alleges:

11

> MBB and Radiology Partners entered into a conspiracy to have MBB paid for medical services not performed by MBB.

*Id.* ¶ 294.

Count seven alleges:

> MBB and Radiology Partners submitted claims and/or caused claims to be submitted to Aetna that it would not have paid to MBB but for the wrongful conduct of MBB and Radiology Partners as described herein.

*Id.* ¶ 301.

Count eight alleges:

> MBB and Radiology Partners' unfair trade practices and deceptive acts that comprised their inappropriate billing scheme, by billing Aetna for services provided by other medical groups, misled Aetna and caused Aetna to make substantial payments to MBB and Radiology Partners that were not owed and would not have been paid but for MBB and Radiology Partners' conduct.

*Id.* ¶ 316.

Count ten alleges:

> Through the acts described herein, Radiology Partners and MBB caused the overpayment of funds on behalf of ERISA-governed benefit plans in violation of the benefit plans' terms and such benefit plans authorize Aetna to seek to recover such overpayments and to halt Defendants' continuing efforts to defraud and otherwise obtain overpayments from such benefit plans.
>
> Radiology Partners and MBB are continuing to engage in their fraudulent and tortious acts presently, including continuing to submit claims using MBB's TIN for non-MBB providers in an effort to procure overpayments and, in turn, use such overpayments to coerce a more lucrative

> in-network contract for MBB and Radiology Partners' others Florida-based medical groups.

*Id.* ¶¶ 341-42.

Count eleven alleges:

> Radiology Partners and MBB are continuing to submit claims using MBB's TIN for non-MBB providers.
>
> *First*, there is a controversy as to Aetna's obligation to pay for services billed using MBB's TIN that were rendered by non-MBB providers, both retroactively and prospectively.
>
> *Second*, there is a controversy as to whether Radiology Partners and MBB have violated—and are continuing to violate—the No Surprises Act by initiating NSA arbitrations on behalf of MBB for services rendered by non-MBB providers.

*Id.* ¶¶ 350-52.

Each count asserted against the defendants is premised upon allegations that relate to their billing practices, but do not specify whether they apply to the contract or post-contract period. As noted above, this is significant for several reasons, including to this Court's determination as to whether arbitration should be compelled. And when confronted with this ambiguity, Aetna claims that its causes of action relate only to the post-contract period. *See generally* doc. 48. But, as articulated above, the complaint itself does not support such a reading and so the Court cannot credit Aetna's position, nor can it reach the merits of the complaint as currently pled.

The Court also finds, however, that the ambiguities of the complaint would likely be cured by amendment, and so the undersigned recommends that Aetna be directed to file an amended complaint. Under Fed. R. Civ. 15(a)(2), a plaintiff may

13

amend its complaint with the opposing party's consent or leave of court. The Court should give leave liberally when justice requires, but not when there has been undue delay, bad faith or dilatory motives, amendment would cause undue prejudice against the non-moving party, or when it would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962).[7]

A review of the docket reveals that Aetna has not previously amended their complaint, nor requested leave to do so. Additionally, the case is still in its early stages, with the current discovery deadline not set to expire until April 2026 and trial to commence in February 2027. Doc. 35. Moreover, the undersigned finds that Eleventh Circuit precedent dictates that Aetna be directed to amend its complaint to cure the deficiencies identified above. *See Weiland*, 792 F.3d at 1321 n.10 ("[W]e have also advised that when a defendant fails to [move for a more definite statement], the district court ought to take the initiative to dismiss or strike the shotgun pleading and give the plaintiff an opportunity to replead."). In amending its complaint, Aetna shall separate each cause of action into its own count, clearly articulate the alleged misconduct that supports each count, and clarify the time period of the alleged misconduct that gave rise to the same.

---

[7] An amendment is futile, for example, when the amended complaint would still be subject to dismissal. *See Florida Power & Light Co. v. Allis Chalmers Corp.,* 85 F.3d 1514, 1520 (11th Cir. 1996).

## Recommendation

I respectfully **recommend**:

1. The complaint, doc. 1, be **stricken** and Aetna **be directed to amend their complaint** in accordance with the principles outlined above;

2. Defendants' Motion to Dismiss and Memorandum of Law, doc. 27, and Defendants' Motion to Compel Arbitration, Motion to Stay, and Incorporated Memorandum of Law, doc. 28, be **denied as moot**; and

3. Defendants be directed to respond in accordance with the Federal Rules of Civil Procedure.

**Entered** in Jacksonville, Florida on August 11, 2025.

LAURA LOTHMAN LAMBERT
United States Magistrate Judge

### Notice to the Parties

"Within 14 days after being served with a copy of [a report and recommendation on a dispositive issue], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including a waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

c:
The Honorable Brian J. Davis, United States Senior District Judge
Nathaniel Moore, Esquire

Kyle D. Nelson, Esquire
Marcus A. Guith, Esquire
Paul D. Weller, Esquire
Jared Joseph Burns, Esquire
Glenn E. Solomon, Esquire
Christopher Charles Jew, Esquire
Michael H. Thompson, Esquire
Samantha Joy Kavanaugh, Esquire
Sara Ann Brinkmann, Esquire
Maria Dolores Garcia, Esquire