# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| AETNA HEALTH INC., AETNA LIFE INSURANCE COMPANY, and AETNA HEALTH INSURANCE COMPANY, <br><br> *Plaintiffs*, <br><br> vs. <br><br> RADIOLOGY PARTNERS, INC. and MORI, BEAN AND BROOKS, INC., <br><br> *Defendants*. | Case No. 3:24-cv-01343-BJD-LLL <br><br> **DEMAND FOR JURY TRIAL** <br><br> **DECLARATORY AND INJUNCTIVE RELIEF REQUESTED** |

## AMENDED COMPLAINT

## INTRODUCTION

1.    Defendant Radiology Partners, Inc. ("Radiology Partners") has perpetrated a years-long healthcare fraud scheme against Plaintiffs Aetna Health Inc., Aetna Life Insurance Company, and Aetna Health Insurance Company (collectively "Aetna"), defrauding Aetna and its plan sponsors out of millions of dollars through fraudulent medical claims in the State of Florida.

2.    This lawsuit is about the second act of that scheme. Specifically, this lawsuit relates to claims billed to Aetna by Defendants on an out-of-network basis after the termination of the contract between Aetna and Defendant Mori, Bean, and Brooks, Inc. ("MBB").

3.    Radiology Partners is a private equity-backed aggregator of radiology practices across the country. Upon information and belief, Radiology Partners

controls all material aspects of these radiology practices' businesses—including billing and collections—but conceals doing so to appear compliant with certain states' prohibitions on the corporate practice of medicine.

4.    Since Radiology Partners was formed in 2012, it has acquired—or, in its own terms, "affiliated"—with at least nine radiology groups in Florida that each had or have their own in-network contracts with Aetna. MBB is one such group.

5.    In phase one of the scheme, Radiology Partners identified MBB as having the most lucrative in-network contracts with commercial payors in Florida, including Aetna, and began using MBB's name and Tax Identification Number ("TIN") to bill for services performed by *all* its "affiliated" Florida radiology groups. Radiology Partners' use of MBB's TIN to bill for services performed by other radiology groups misrepresented that MBB—as opposed to another radiology group with its own separate in-network contract—performed the services billed.

6.    By 2022, MBB was submitting significantly more claims to Aetna than it had historically because of Radiology Partners' scheme. But when asked about this increase in claims volume, MBB deflected Aetna's inquiries. Ultimately, Aetna terminated MBB's in-network contract, causing MBB to go "out-of-network" with Aetna. The other radiology groups implicated by Radiology Partners' scheme remained "in-network" with Aetna, however.

7.    Defendants could have halted their fraudulent practices after the termination of MBB's in-network contract. Instead, they pivoted to a second phase in their fraudulent scheme that is at issue in this lawsuit: using MBB's TIN to bill

for services performed by other affiliated Florida radiology groups on an out-of-network basis, despite the fact that those groups were (and still are) in-network with Aetna. This second phase of the scheme is the focus of this lawsuit.

8.      Rather than bill the services provided by Radiology Partners' *other* radiology practices through those groups' contracts with Aetna, the Defendants continued to bill all services through MBB, using MBB's TIN. This was a material misrepresentation that caused Aetna to pay MBB funds to which it was not entitled.

9.      Through their actions, Defendants caused Aetna and its plan sponsors to pay significantly more for the *same* services provided by the *same* physicians at the *same* hospitals. This was a purely profit-driven scheme and, upon information and belief, motivated by Radiology Partners' greed and desire to gin up additional revenue to satisfy the demands of its private equity owners.

10.     As an out-of-network radiology provider, MBB's claims were also now subject to the No Surprises Act ("NSA"), 42 U.S.C. §§ 300gg-111, which is intended to protect patients from surprise medical bills when, for example, they unwittingly receive services from out-of-network providers (such as MBB) at in-network hospitals. The NSA does *not* apply to in-network providers.

11.     Defendants wrongfully initiated tens of thousands of disputes under the NSA's independent dispute resolution ("IDR") process for services that were provided by the Radiology Partners-controlled medical groups *that had in-network contracts with Aetna*. These IDRs were all initiated based on Defendants'

misrepresentations that they were for medical services provided by MBB. In truth, the services were provided by other medical groups who had contracts with Aetna, rendering them ineligible for IDR under the NSA.

12.     In initiating each IDR, Defendants knowingly provided false certifications to Aetna, the Independent Dispute Resolution Entities ("IDRE") who administered the IDR process, and the U.S. Department of Health & Human Services that "the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process."

13.     Upon information and belief, Defendants initiated these fraudulent IDR proceedings because they knew: (i) Aetna would not have sufficient information to identify whether the services were actually provided by MBB; (ii) Defendants could support their demand for extremely high payments based on data and information tainted by the first phase of their fraud scheme; (iii) Defendants could cheat the system by batch-filing thousands of claims simultaneously to overwhelm Aetna and inhibit its ability to respond timely; and (iv) Defendants would be paid more through the NSA IDR process than they would receive under the in-network radiology groups' existing in-network contracts.

14.     The scope of Defendants' IDR scheme is staggering. As scholars studying NSA IDR data noticed, Radiology Partners and three other private-equity-backed provider groups have accounted for "a large and disproportionate

share of IDR cases."[1] Radiology Partners is responsible for over 90% of all IDR cases involving claims for professional radiology services.

15.    Still, Defendants were not content. They then used the aggregate results of the fraudulent NSA IDRs—and the millions of dollars in fees, overhead, and additional personnel expenses Aetna was forced to incur as a result—to bolster coercive demands for a new, extremely lucrative in-network contract for MBB.

16.    Through this action, Aetna seeks: (i) vacatur of the fraudulently obtained IDR awards obtained to date, including but not limited to those listed in **Exhibit A,** under 9 U.S.C. § 10(a); (ii) damages from disputed claims not submitted to IDR; and (iii) any other relief that the Court deems just and proper.

## THE PARTIES

17.    Plaintiff Aetna Health Inc. is a Florida corporation with its principal place of business in Plantation, Florida.

18.    Plaintiff Aetna Life Insurance Company is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

19.    Plaintiff Aetna Health Insurance Company is a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania.

20.    Defendant Radiology Partners, Inc. is a Delaware corporation. According to filings made by Radiology Partners with the Florida Department of State, its principal place of business is in El Segundo, California.

---

[1] Matthew Fiedler and Loren Adler, *A First Look at Outcomes Under the No Suprises Act Arbitration Process*, Brookings (Mar. 27, 2024), https://www.brookings.edu/articles/a-first-look-at-outcomes-under-the-no-surprises-act-arbitration-process/.

21.    Defendant Mori, Bean, and Brooks, Inc. is a Florida corporation. According to filings made by MBB with the Florida Department of State, its principal place of business is in Jacksonville, Florida.

<u>**JURISDICTION AND VENUE**</u>

22.    The NSA authorizes judicial review of awards issued in IDR proceedings under the same circumstances enumerated in Section 10(a) of the Federal Arbitration Act. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II); 9 U.S.C. § 10.

23.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1331 because it arises under federal law. Specifically, Aetna asserts a claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* This court also has subject-matter jurisdiction over this matter pursuant to the NSA and its implementing regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, because this matter requires the Court to interpret and apply the NSA and its implementing regulations, and because 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) expressly authorizes judicial review under the circumstances present here. Finally, the Court further has subject-matter jurisdiction over Aetna's state and common law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy.

24.    This Court has general and specific jurisdiction over MBB because MBB is domiciled in Florida, its principal place of business is in Florida, and it

systematically and continuously conducts business in Florida, including the acts that give rise to this lawsuit.

25.    This Court has specific jurisdiction over Radiology Partners because it directed, aided and abetted, conspired to commit, and did commit tortious acts within Florida. *See* Fla. Stat. § 48.193(1)(a)(2). Specifically, Radiology Partners acquired MBB in Florida, used MBB to submit fraudulent claims to Aetna for medical services rendered in Florida, and took additional tortious acts and/or omissions in Florida as described below. Radiology Partners' scheme also caused injury to Aetna and its plan sponsors in Florida, which includes health benefit plans for employees of local governmental bodies in Florida.

26.    Upon information and belief, Radiology Partners has complete control over MBB's operations and acts, derives all residual benefits and bears all residual losses from MBB's operations, and exercises control over MBB to carry out its fraudulent claim submissions. For example, when Aetna corresponded with MBB, personnel from Radiology Partners (using Radiology Partners' email addresses) typically responded. Thus, the Court has jurisdiction over Radiology Partners as an alter ego of MBB.

27.    Venue is proper in this District under 28 U.S.C. § 1391 because MBB resides in this district and a substantial part of the events giving rise to the claims in this action occurred in this District. Specifically, within this District, Radiology Partners acquired MBB, MBB and Radiology Partners conspired together to

submit fraudulent claims, and MBB and Radiology Partners initiated improper NSA IDR proceedings while identifying MBB's address as within this District.

## THE IMPACTED HEALTH BENEFIT PLANS

28.   Aetna is a managed care company that offers a broad range of healthcare and related plans and services to its plan sponsors and members.

29.   Aetna brings these claims on its own behalf as the provider of fully-insured health plans through which individuals, employees, and employers pay Aetna premiums in exchange for Aetna agreeing to pay their healthcare claims using Aetna's money. A portion of the claims at issue in this case are fully insured claims. Thus, Aetna was induced to pay its own funds to Defendants as part of the improper billing scheme.

30.   Aetna also brings this action as the claims administrator for self-funded, employer-established health plans that retain Aetna as a third-party administrator to process employees' healthcare claims and pay those claims out of a pool of money comprised of funds contributed by employers and their employees.

31.   Aetna delivers these services pursuant to contracts between Aetna and the health plans' sponsors, which identify the rights and obligations of each party.

32.   For the majority of the self-funded plans at issue, Aetna is conferred limited discretionary authority to, *inter alia*, determine entitlement to benefits under the self-funded plans. Although the language varies slightly between benefit plans, the following is representative:

"Customer hereby delegates to Aetna discretionary authority to determine entitlement to benefits under the applicable Plan Documents for each claim received, including discretionary authority to determine and evaluate facts and evidence, and discretionary authority to construe the terms of the plan. It is also agreed that, as between Customer and Aetna, Aetna's decision on any claim is final and that Aetna has no other fiduciary responsibility."

33.    In this capacity, Aetna has processed claims and appeals on behalf of the impacted self-funded plans.

34.    Similarly, the self-funded plans at issue entered into contracts that give Aetna the authority and discretion to recover overpayments. Although the language varies slightly between contracts, the following is representative:

"If it is determined that any payment has been made by Aetna to or on behalf of an ineligible person, or if it is determined that more than the appropriate amount has been paid, Aetna shall undertake good faith efforts, as determined by Aetna to be appropriate, to recover the payment."

35.    In its capacity as an insurer and claims administrator, Aetna processes over one million healthcare claims per workday, and is responsible for processing and administering hundreds of millions of healthcare claims per year.

36.    Aetna's plans function in accordance with insurance policies, contracts, and/or plan documents, which establish, among other things, the rights and responsibilities of the payor entities and of the individuals who have enrolled in the policies, contracts, and/or plans.

37.    Aetna has authority to seek recoveries on behalf of the self-funded plans at issue, in addition to payments made by Aetna's fully insured plans.

## RADIOLOGY PARTNERS AND ITS RAPID GROWTH FUELED BY PRIVATE-EQUITY FIRMS

38.    Radiology Partners is a private-equity-backed aggregator of radiology groups based in El Segundo, California. It was created in 2012.

39.    Radiology Partners now claims $3 billion in annual revenue,[2] employs more than 3,900 radiologists at 3,400 sites in all 50 states,[3] and handles more than 10% of the country's imaging volume.[4]

40.    Radiology Partners' rapid growth follows from its founders' core business plan: to consolidate the radiology market. As its private-equity backers exclaimed when raising an initial $700 million for Radiology Partners, it was "time to pour gasoline" on a "fragmented" radiology market.[5]

41.    Upon information and belief, the private equity firms backing Radiology Partners have exerted and continue to exert considerable control, influence, and direction over the operations of Radiology Partners and its "affiliated" radiology practices.

42.    For instance, New Enterprise Associates ("NEA")—the largest private equity investor in Radiology Partners—has invested hundreds of millions of dollars

---

[2] Marty Stempniak, *S&P expects Radiology Partners to generate positive free cash flow for 1st time in years*, Radiology Business (Mar. 6, 2024) https://radiologybusiness.com/topics/healthcare-management/healthcare-economics/sp-expects-radiology-partners-generate-positive-free-cash-flow-1st-time-years.
[3] *Our Practices*, Radiology Partners, https://www.radpartners.com/about-us/our-practices/.
[4] Emily Hayes, *What's the Endgame for Private Equity in Radiology?*, AuntMinnie.com (Dec. 14, 2021), https://www.auntminnie.com/industry-news/article/15630042/whats-the-endgame-for-private-equity-in-radiology.
[5] Heather Mack, *NEA-Founded Radiology Startup Hits $4 Billion Valuation*, Wall Street Journal, (July 18, 2019), https://www.wsj.com/articles/nea-founded-radiology-startup-hits-4-billion-valuation-11563492304.

in the company. Radiology Partners' Chairman, Chief Executive Officer, and Co-Founder, Rich Whitney, is a partner in NEA. Mohamad Makhzoumi, the co-Chief Executive Officer of NEA, has also been on Radiology Partners' Board of Directors throughout the period relevant to this dispute.

43.    Star Investment Holdings ("SIH") has also invested hundreds of millions into Radiology Partners. Geoff Clark, a former Senior Managing Director at SIH, was on Radiology Partners' Board of Directors during the relevant period.

44.    Radiology Partners says the "commonality among [its] handful of outside investors is that they are growth oriented . . . ."[6]

45.    Upon information and belief, in exchange for pouring billions of dollars into Radiology Partners, the company's funders (including NEA and SIH) demanded growth and a sizable return on investment. To accomplish that goal, Radiology Partners turned to the scheme set forth herein.

## MBB IS ACQUIRED BY RADIOLOGY PARTNERS

46.    Radiology Partners carries out its operations through local radiology groups that it acquires and then controls. MBB is one example.

47.    Prior to Radiology Partners, MBB was a radiology group in Jacksonville, Florida with a few dozen radiologists. Its directors and officers were physicians who practiced at MBB.

---

[6] Dr. Gavin Slethaug, *Let's Talk About Private Equity and Other Outside Investors in Radiology*, Radiology Partners (Feb. 14, 2024), https://www.radpartners.com/2024/02/lets-talk-about-private-equity-and-other-outside-investors-in-radiology/.

48.    For over a decade, MBB billed Aetna for services performed by a few dozen physicians at hospitals in and around Jacksonville, Florida.

49.    On September 28, 2018, Radiology Partners acquired MBB for more than $130 million.

50.    After the acquisition, the existing MBB directors and officers were replaced with employees of Radiology Partners. As a result, upon information and belief, Radiology Partners could and did exercise complete control over MBB.

51.    Radiology Partners touts itself as simply a "billing" or "management" company for its affiliated medical groups. In reality, it had and continues to have complete control over the operations of those medical groups, provides full financial and management support, and takes all residual benefits and bears all residual losses from the medical groups' operations.

52.    These medical groups are reliant on Radiology Partners for their day-to-day operations. Indeed, Radiology Partners states to investors that it provides its affiliated medical groups "clerical and administrative personnel, accounting services, billing and collection, provision of medical and office supplies, maintenance of medical records, IT support, and advertising, marketing, and promotional activities."[7]

---

[7] Radiology Partners, Inc. Offering Memorandum (Jan. 24, 2020).

## RADIOLOGY PARTNERS USES MBB TO BILL FOR SERVICES RENDERED BY ITS OTHER RADIOLOGY GROUPS IN FLORIDA

53.    MBB's In-Network Agreement was relatively lucrative compared to those of the other medical groups Radiology Partners acquired. Because of that, Radiology Partners decided to bill services rendered by its *other* Florida-based radiology groups *through* MBB, making it appear as though MBB rendered the services, even though MBB did not render the services and the other radiology groups had their own in-network contracts with Aetna that remained operative.

54.    When MBB was acquired by Radiology Partners in September 2018, approximately 50 physicians were actively billing Aetna under MBB's TIN.

55.    This is consistent with statements on MBB's website that the group was comprised of "45 expert Board Certified Radiologists."[8]

56.    Since Radiology Partners acquired MBB, *more than 1,000 different physicians* have billed Aetna under MBB's TIN.

57.    The vast majority of these physicians are actually affiliated with *other* medical groups in Florida that are also owned by Radiology Partners.

58.    Those other medical groups have their own TINs and in-network agreements with Aetna that they used to bill for services rendered by these physicians until Radiology Partners gave the directive to bill all services across Florida under MBB's TIN.

---

[8] MBB Radiology Home Page, https://mbbradiology.com/.

59.    Aetna terminated the In-Network Agreement with MBB in July 2022, but Defendants did not stop funneling bills from other medical groups through MBB's TIN. Instead, they started billing Aetna for services rendered by non-MBB providers through MBB's TIN on an out-of-network basis, even though the providers worked for medical groups with in-network contracts with Aetna.

60.    These physicians continued to provide the same care, to the same patients, in the same locations. The only difference was that Defendants billed the services using MBB's TIN to deceive Aetna into paying more for each service.

61.    The following examples are representative of the hundreds of non-MBB physicians whose services Defendants improperly caused to be billed using MBB's TIN on an out-of-network basis:

### i.    **Dr. Navid Nouri.**

62.    Dr. Nouri joined Radiology Associates of South Florida in 2014.

63.    Radiology Associates of South Florida is a radiology group in Florida that has its own TIN and in-network contract with Aetna.

64.    Dr. Nouri submitted claims to Aetna under Radiology Associates of South Florida's TIN for years.

65.    In March 2018, Radiology Partners acquired Radiology Associates of South Florida.

66.    Unbeknownst to Aetna, after Radiology Partners acquired MBB, Radiology Partners directed that services provided by its affiliated medical groups in Florida be billed using MBB's TIN.

67.    Specifically, in or around December 2021, Radiology Partners directed and caused all services rendered by Radiology Associates of South Florida to be billed under MBB's TIN.

68.    Thereafter, claims for services rendered by Dr. Nouri began being billed almost exclusively under MBB's TIN.

69.    For example, on September 18, 2022, Dr. Nouri conducted an ultrasound read that was billed using CPT code 93976. If this had been billed to Aetna using Radiology Associates of South Florida's TIN, it likely would have resulted in payment of $78.89 to Radiology Associates of South Florida.

70.    However, because it was billed using MBB's TIN on an out-of-network basis and because of certain other steps taken by Defendants to increase the amount they received if services were billed through MBB, Aetna paid $752.00.

71.    Thus, by switching to MBB's TIN, Radiology Partners wrongfully caused Aetna to pay 953% more than it should have for an ultrasound by Dr. Nouri.

72.    Even now, though, Dr. Nouri appears on Radiology Associates of South Florida's website:



73.    He   also   publicly   identifies   himself   on   LinkedIn   as   a
"Neuroradiologist" for "Radiology Associates of South Florida (RASF)."

74.    Dr. Nouri and Radiology Associates of South Florida are also both
being sued for medical malpractice. *See M.B.S. v. Baptist Hospital of Miami, Inc.
et al.*, Case No. 2023-022822-CA-01 (11th Judicial Circuit, Miami-Dade County).

75.    In response to discovery served by the plaintiff in that action, Dr.
Nouri recently admitted that he "was an employee of Radiology Associates of South
Florida . . . on May 5, 2022."

> 2. Admit or deny that at all times while Plaintiff M.B.S. was your patient, you were an employee of RADIOLOGY ASSOCIATES OF SOUTH FLORIDA, INC. (hereinafter RADIOLOGY ASSOCIATES").
>
> **Response:** **It is admitted that Dr. Nouri was an employee of Radiology Associates of South Florida, LLC when he interpreted a Brain and Orbit MRI without contrast and a Chest x-ray performed on M.B.S. at Baptist Hospital of Miami, Inc. on May 5, 2022.**

76.    Radiology Associates of South Florida also admitted that "Navid Nouri, MD was an employee of Radiology Associates of South Florida, LLC . . . on May 5, 2022":

> 4. Admit or deny that at all times when NOURI treated Plaintiff M.B.S. on May 5, 2022, NOURI was acting as an employee of RADIOLOGY ASSOCIATES, and was acting within his scope and duties for said employer.
>
> **Response: It is admitted that Navid Nouri, M.D. was an employee of Radiology Associates of South Florida, LLC and acting within the scope of his employment when he interpreted a Brain and Orbit MRI without contrast and a Chest x-ray performed on M.B.S. at Baptist Hospital of Miami, Inc. on May 5, 2022.**

77.    All said, Aetna has paid MBB more than $118,000 on at least 610 claims for services rendered by Dr. Nouri billed under MBB's TIN on an out-of-network basis independent of the NSA IDR process. MBB never would have received the payment from Aetna that it did on these claims if not for Radiology Partners' wrongful conduct.

### ii.    Dr. Amy B. Whitley.

78.    Dr. Amy B. Whitley is another example of how Radiology Partners effectuated the scheme.

79.    Dr. Whitley joined Radiology Associates of South Florida in approximately 2002.

80.    Dr. Whitley submitted claims to Aetna under Radiology Associates of South Florida's TIN for years.

81.    But after Radiology Partners acquired Radiology Associates of South Florida, claims for services rendered by Dr. Whitley transitioned to being billed almost exclusively under MBB's TIN.

82.    For instance, on July 6, 2023, Dr. Whitley conducted an ultrasound read of the uterus (CPT Code 76817). If this read had been billed to Aetna using Radiology Associates of South Florida's TIN, it would have resulted in payment of $75.67 to Radiology Associates of South Florida

83.    However, in or around December 2021, Radiology Partners directed and caused all services rendered by Radiology Associates of South Florida to be billed under MBB's TIN.

84.    As a result, because it was billed using MBB's TIN on an out-of-network basis, Aetna paid $526.00 for the read.

85.    Thus, by billing with MBB's TIN, Radiology Partners wrongfully caused Aetna to pay 695% more than it should have for an ultrasound read by Dr. Whitley under Aetna's agreement with Radiology Associates of South Florida.

86.    Dr. Whitley is still listed on Radiology Associates of South Florida's website as "an associate with Radiology Associates of South Florida":



87.    She identifies herself on LinkedIn as a "Radiologist" for "Radiology Associates of South Florida."

88.    The result of Defendants' efforts to misrepresent Dr. Whitley as being associated with MBB is that Aetna paid MBB funds to which it was not entitled.

89.    In fact, Aetna has paid MBB more than $49,000 on at least 331 claims for services rendered by Dr. Whitley billed under MBB's TIN on an out-of-network basis independent of the NSA IDR process. MBB never would have received the payment from Aetna that it did on these claims if not for Radiology Partners' wrongful billing conduct.

### iii.    Dr. Claude B. Guidi.

90.    Dr. Claude B. Guidi is another example of how Radiology Partners has

carried out this scheme.

91.    Dr. Claude B. Guidi joined Radiology Associates of Tampa in approximately 1986.

92.    Radiology Associates of Tampa is a radiology group that has its own TIN and in-network agreement with Aetna.

93.    Dr. Guidi submitted claims to Aetna using Radiology Associates of Tampa's TIN for years.

94.    However, in early 2018, Radiology Partners acquired Radiology Associates of Tampa.[9] In or around July 2019, Radiology Partners directed that all services rendered by Radiology Associates of Tampa be billed using MBB's TIN.

95.    For example, on November 17, 2022, Dr. Guidi completed a read of an abdominal CT scan (CPT Code 74176). If this read had been billed to Aetna using Radiology Associates of Tampa's TIN, it would have resulted in payment of $120.99 to Radiology Associates of Tampa.

96.    However, because it was billed using MBB's TIN on an out-of-network basis, MBB caused Aetna to pay MBB $1,045.80.

97.    Thus, by switching the billing to MBB's TIN, Radiology Partners wrongfully caused Aetna to pay over 864% more than it should have—in fact, the patient paid almost as much in coinsurance as should have been paid *in total*.

98.    Dr. Guidi identifies himself as an "MD" at "Radiology Associates of Tampa" on LinkedIn.

---

[9] Thereafter, Radiology Partners rebranded the group to Radiology Associates of Florida.

99.    Overall, Aetna has paid MBB more than $17,000 on at least 143 claims for services rendered by Dr. Guidi billed under MBB's TIN on an out-of-network basis independent of the NSA IDR process. MBB never would have received the payment from Aetna that it did on these claims if not for Radiology Partners' wrongful billing conduct.

100.    Drs. Nouri, Whitley, and Guidi are examples of the hundreds of physicians whom Defendants caused to be improperly billed on an out-of-network basis using MBB's TIN.

101.    Upon information and belief, Radiology Partners improperly billed tens of thousands of claims on an out-of-network basis under MBB's TIN that did not go through the NSA IDR process.

## RADIOLOGY PARTNERS AND MBB ABUSE THE NSA IDR PROCESS

### A.    The NSA and its IDR process.

102.    In 2020, Congress enacted the NSA, codified in 42 U.S.C. §§ 300gg-111–12, to end "surprise medical bills." Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020).

103.    The NSA established an IDR process for resolving payment disputes between out-of-network providers and group health plans and health insurers.

104.    If the parties cannot resolve the dispute through negotiation, they may then proceed to IDR. *Id.* § 300gg-111(c)(1)(B).

105.    In initiating the IDR process, the provider must provide an "attestation that the items and services under dispute are qualified IDR items or services." 45 C.F.R. 149.510(b)(2)(iii)(A)(6).

106.    Notably, the NSA IDR process is only available to a "nonparticipating provider or a nonparticipating facility." *Id.* § 300gg-111(c)(1)(A).

107.    A "nonparticipating provider" is defined as a "health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who does not have a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively." *Id.* § 300gg-111(a)(3)(E)(v)(G)(i).

108.    In contrast, a "participating provider" is defined as a "health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who has a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively." *Id.* § 300gg-111(a)(3)(E)(v)(G)(ii).

109.    The IDR process is a "baseball-style" process. The provider and insurer each submit a proposed payment amount and explanation to the IDRE. *Id.* § 300gg-111(c)(5)(B).

110.    The IDRE must then select one of the two proposed amounts, considering various factors including median in-network contracted rates, characteristics of the provider (*e.g.*, quality, experience, or teaching status), each party's market share, and patient acuity. *Id.* § 300gg-111(c)(5)(C)(ii).

111.    The NSA IDR process is costly. The entities and IDREs that oversee the process charge administrative fees, which are the responsibility of the party that loses the dispute. *Id.* § 300gg-111(c)(5)(F)(i).

**B.    Radiology Partners Submits Thousands of Ineligible Claims from In-Network Providers Under the NSA IDR Process by Using MBB's TIN.**

112.    Aetna terminated MBB's In-Network Agreement in July 2022.

113.    However, the other medical groups owned by Radiology Partners in Florida—such as Radiology Associates of South Florida, Radiology Associates of Florida, Bethesda Radiology Associates, Inc., Radiology Associates of Tampa, and Coastal Vein & Vascular Institute—had and have in-network contracts with Aetna.

114.    Accordingly, claims rendered by physicians of those medical groups should have been submitted under their own TINs on an *in-network* basis.

115.    Instead, Radiology Partners directed those claims be fraudulently billed on an *out-of-network* basis under MBB's TIN.

116.    Upon information and belief, Radiology Partners and MBB undertook this improper out-of-network billing strategy with the intent to improperly avail themselves of the NSA IDR process, extract large IDR awards, force Aetna and its plan sponsors to incur needless fees and expenses, and further drive up the cost of radiology services across the market for patients and plan sponsors.

117.    Each time it initiated the IDR process under the NSA, MBB falsely "attested" to the Department of Health & Human Services, the IDREs, and Aetna "that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s)

within the scope of the Federal IDR process." Below is a representative example of this false attestation:

> ☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **Signature:**                                    **Date:**
> Mori, Bean, and Brooks, Inc.                      10/31/2024

118.    This attestation was not accurate because "the item(s) and/or service(s) at issue" were not, in fact, "qualified item(s) and/or service(s) within the scope of the Federal IDR process." Indeed, the services at issue were rendered by participating (*i.e.*, in-network) providers.

119.    MBB and Radiology Partners have wrongly billed for services rendered by hundreds of non-MBB physicians using MBB's TIN, and thereafter improperly initiated NSA IDRs with respect to such services.

120.    These NSA IDRs are initiated in bulk by Defendants so to overwhelm Aetna's ability to respond. By way of one example, MBB initiated NSA IDRs for approximately *5,603 claims* on March 7, 2024. The next day, MBB initiated NSA IDRs for at least *another 4,856 claims*.

121.    The following examples are representative of how this piece of Defendants' scheme has played out:

### i.  Dr. Juan Carlos Diez.

122.    According to Radiology Associates of South Florida's website, Dr. Diez is "a partner with the Radiology Associates of South Florida":



123.    Dr. Diez's license with the Florida Department of Health also lists his practice as Radiology Associates of South Florida.

124.    Dr. Diez submitted claims to Aetna using Radiology Associates of South Florida's TIN for years.

125.    But, after Radiology Partners acquired MBB and Radiology Associates of South Florida, Dr. Diez's claims were billed almost exclusively using MBB's TIN.

126.    When Aetna terminated the In-Network Agreement with MBB, Dr. Diez's claims continued to be billed under MBB's TIN on an out-of-network basis, despite the fact that Radiology Associates of South Florida still had (and continues to have) an in-network contract with Aetna.

127.    This is done so that Radiology Partners and MBB could wrongly weaponize the NSA IDR process.

128.    For instance, MBB submitted an out-of-network claim to Aetna for abdomen imaging conducted by Dr. Diez on October 19, 2022.

129.    Aetna reasonably relied on the misrepresentation that MBB provided the service, that it was properly billed by MBB, and paid $48.98 on the claim.

130.    Defendants then disputed this amount and initiated an NSA IDR (Federal Case ID #DISP-0268495). Upon information and belief, MBB and Radiology Partners submitted briefs and information to the IDREs based on inflated reimbursement data from the in-network phase of the scheme.[10]

131.    Through the NSA IDR, MBB was awarded $427.79, which is more than 450% of the Medicare rate.

132.    Aetna was also charged administrative fees of $750.

133.    In total, Aetna was forced to pay $1,117 on a claim that never should have been billed by MBB and for which MBB was not entitled to payment.

134.    In total, Radiology Partners and MBB have billed more than 4,000 claims to Aetna using MBB's TIN for services provided by Dr. Diez. The total billed charges on these claims exceeds $2.8 million.

---

[10] Aetna does not receive a copy of the IDR submission filed by Defendants.

ii.     **Dr. Louis P. Freeman.**

135.    Dr. Louis P. Freeman is another example of the scheme.

136.    According to Radiology Associates of South Florida's website, Dr. Freeman is "a partner with Radiology Associates of South Florida":



137.    Dr. Freeman identifies himself on LinkedIn as a "Partner" and "Diagnostic Radiologist" for Radiologist Associates of South Florida since 2006.

138.    Dr. Freeman billed claims to Aetna for years using Radiology Associates of South Florida's TIN.

139.    After Radiology Partners acquired MBB and Radiology Associates of South Florida, Dr. Freeman's claims were billed almost exclusively using MBB's TIN.

140.    After Aetna terminated the In-Network Agreement with MBB, Dr. Freeman's claims continued to be billed "out-of-network" under MBB's TIN, even though Radiology Associates of South Florida had (and still has) its own in-network contract with Aetna.

141.    For instance, Defendants billed Aetna using MBB's TIN for an abdominal image read by Dr. Freeman on September 15, 2022.

142.    Aetna reasonably relied on the misrepresentation that MBB provided the service and paid $51.30 on the out-of-network claim.

143.    MBB then disputed this amount and initiated an NSA IDR (Federal Case ID #DISP-0268632).

144.    MBB was awarded $427.79 by the IDRE, which is more than 450% the Medicare rate.

145.    Aetna was also forced to pay administrative fees of $1,150.

146.    Thus, in total, Aetna was forced to pay $1,577.79 on a claim that never should have been billed by MBB and that was ineligible for an NSA IDR.

147.    Radiology Partners and MBB have billed Aetna more than 3,600 claims for services rendered by Dr. Freeman using MBB's TIN, with total billed charges of more than $2 million.

### iii.  Dr. Pedro L. Fernandez.

148.    Dr. Pedro L. Fernandez is another example of Defendants' scheme.

149.    According to Radiology Associates of South Florida's website, Dr. Fernandez is "a partner with the Radiology Associates of South Florida":



150.    Dr. Fernandez's license with the Florida Department of Health also lists his practice as Radiology Associates of South Florida.

151.    For years, Dr. Fernandez submitted claims to Aetna using Radiology Associates of South Florida's TIN.

152.    But after Radiology Partners acquired MBB and Radiology Associates of South Florida, claims for services rendered by Dr. Fernandez began being billed under MBB's TIN.

153.    After Aetna terminated the In-Network Agreement with MBB, Dr. Fernandez's claims continued to be billed "out-of-network" under MBB's TIN, even though they should have been billed by Radiology Associates of South Florida, which had (and still has) an active in-network contract with Aetna.

154.    For instance, MBB submitted an out-of-network claim to Aetna for head and neck imaging conducted by Dr. Fernandez on October 7, 2022.

155.    Aetna reasonably relied on the misrepresentation that MBB provided the service and paid $125.65 on the out-of-network claim to MBB.

156.    MBB then disputed this amount and initiated an NSA IDR (Federal Case ID #DISP-0267896).

157.    MBB was awarded $535.99 by the IDRE, which is more than 450% the Medicare rate.

158.    Aetna was also forced to pay administrative fees of $1,050.

159.    Thus, in total, Aetna was forced to pay $1,585.99 on a claim that never should have been billed by MBB and that was ineligible for NSA IDR.

160.    All said, Radiology Partners and MBB have billed Aetna more than 3,000 claims for services rendered by Dr. Fernandez using MBB's TIN, with total billed charges of more than $1.7 million.

161.    The examples above are representative of the tens of thousands of claims that Radiology Partners and MBB improperly billed out-of-network using MBB's TIN and then improperly placed at issue in NSA IDRs.

162.    **Exhibit A** hereto is a non-exhaustive list of NSA IDR awards that Radiology Partners and MBB fraudulently obtained for ineligible providers. Discovery is needed to precisely identify the full universe of NSA IDR awards improperly obtained by Defendants through their conduct described herein.

163.    These IDR awards have forced Aetna and its plan sponsors to pay MBB on claims for which it was not entitled to payment. Aetna has also been forced to incur administrative fees on claims that were not eligible for IDR, along with

significant additional overhead necessary to respond to the overwhelming number of NSA IDRs initiated by Radiology Partners.

164.   Upon information and belief, Radiology Partners perpetrated the wholesale fraudulent initiation of these NSA IDRs because it knew it would likely win, including because Aetna was unaware of the scheme and because the NSA IDR process involves little information-sharing between the participants.

165.   The result of this scheme has been an increase in costs for radiology services across the State of Florida.

166.   After extracting thousands of fraudulent NSA IDR awards and substantially increasing the cost of radiology services, Defendants used those results to try to coerce Aetna into signing one or more in-network contracts with Defendants that would have been extremely lucrative for Defendants.

167.   As one MBB representative bragged to Aetna, MBB has a "current NSA win rate of 88%" and Aetna was being forced to face "the non-refundable Administrative fees and IDR Entity fees (which are increasing on average by 20% in '24)[.]"

168.   The MBB representative also warned of a "massive submission looming" that would be "equaling more than $10M." Based on these perceived pressure points, the MBB representative asked Aetna to "create an in-network scenario for MBB" through a new "long-term agreement."

169.   Upon information and belief, this was Radiology Partners' and its private-equity backers' plan all along—to achieve such a dominant share of the radiology market that it could bully and extort above-market contracts.

## RADIOLOGY PARTNERS' AND MBB'S EFFORTS TO CONCEAL THE UNLAWFUL SCHEME

170.   Throughout its scheme, and in concert with MBB, Radiology Partners has gone to extreme lengths to conceal its illicit behavior.

171.   *First*, Radiology Partners gave its employees and agents strict guidelines when dealing with payors like Aetna, which were designed to avoid actions that might "poke the payor" and tip them off.

172.   For instance, after Radiology Partners began causing non-MBB providers to bill using MBB's TIN, Aetna personnel noticed providers outside the Jacksonville area billing with MBB's TIN. Aetna asked for an explanation.

173.   For months, MBB evaded Aetna's many phone calls and emails.

174.   Aetna even reached out to personnel associated with MBB on LinkedIn to try to get a response.

175.   An Aetna employee asked whether MBB was "open[ing] up some new locations in other counties," and that Aetna needed to know, among other things, whether or not "MBB has been acquired or [is] acquiring another group."

176.   In response, an MBB representative responded that the new providers were not from an acquisition but were providers being "hired into MBB." That was untrue as: (a) MBB had been acquired by Radiology Partners and (b) the new

providers billing under MBB's TIN were from other Radiology Partners-controlled medical groups throughout Florida.

177.    When moving physicians from other medical groups over to MBB's TIN, employees were also directed to undergo this process slowly to avoid raising any red flags with payors that would cause them to catch onto the billing scheme.

178.    These directives, and the billing scheme generally, caused Radiology Partners' employees to raise concerns. In return, the employees that complained were often disciplined and/or terminated.

179.    *Second*, Radiology Partners has created a paper trail to try to give its billing scheme the veneer of legitimacy. For example, based on communications Aetna received from at least one hospital, it appears Radiology Partners has misled hospitals who contracted with other Radiology Partners-controlled medical groups in Florida into believing that those non-MBB medical groups were "subsidiaries" of or otherwise owned by MBB. As detailed below, this is false.

180.    Upon information and belief, Radiology Partners also had physicians sign "agreements" with MBB to make it appear as though they are "employed" by MBB, when in reality they are not supervised or controlled by MBB, as exemplified by the sworn discovery responses set forth above.

181.    Indeed, upon information and belief, each medical group has its own "practice board" which oversees that medical group's physicians, and *only* that medical group's physicians. For example, Dr. Lori Lee Bar is a self-described "partner of Radiology Associates of Florida" and the "Member-at-Large on the

Radiology Associates of Florida Local Practice Board of Directors."[11]

182.    Upon information and belief, this means that Dr. Lori Lee Bar and other Radiology Associates of Florida physicians oversee the work of fellow Radiology Associates of Florida physicians. In contrast, MBB does not have any supervision or control over the Radiology Associates of Florida physicians.

183.    *Third*, as payors like Aetna caught on to the scheme, Radiology Partners has tried to retroactively cover its tracks and set up excuses.

184.    For instance, Boca Radiology Group and Radiology Associates of Florida are both groups that were acquired by Radiology Partners. These groups changed their website to claim they are "division[s] of Mori, Bean, and Brooks" and "provide radiology services to patients throughout the United States, including Mori, Bean, and Brooks, Inc":

---

[11] The Inner Circle, *The Inner Circle Acknowledges, Lori Lee Barr, MD, FACR, FAIUM, as a Top Pinnacle Healthcare Professional*, PR Newswire (Nov. 29, 2024, 12:48 ET), https://www.prnewswire.com/news-releases/the-inner-circle-acknowledges-lori-lee-barr-md-facr-faium-as-a-top-pinnacle-healthcare-professional-302318845.html.



185.    Such claims are unfounded because Radiology Partners—not MBB—acquired these medical groups. Indeed, Radiology Partners admits it is the owner of these groups in its communications to investors. Moreover, these medical groups continue to be separate and standalone legal entities actively registered in Florida with the Secretary of State. Finally, several of these medical groups were acquired by Radiology Partners *before* the acquisition of MBB. Thus, it is illogical for these other groups to be the subsidiaries of MBB.

186.    Relatedly, on September 6, 2024, MBB made a filing with the Florida Secretary of State to declare "RADIOLOGY ASSOCIATES OF FLORIDA" as one of its fictitious names. But "RADIOLOGY ASSOCIATES OF FLORIDA, P.A." has been

a fictitious name of Radiology Associates of Tampa—a separate medical group that has its own TIN and in-network contract with Aetna—since 2013.

187. *Fourth*, and finally, when Radiology Partners acquires a medical group, it sets up one of its physicians or executives as the nominal owner of the medical group. Not only does this help Radiology Partners comply with various states' prohibition on the corporate practice of medicine, but it also obscures the fact that Radiology Partners has obtained complete control of another group.

## COUNT ONE – FRAUD
### (Against Radiology Partners and MBB)

188. This cause of action applies with respect to benefit claims that were submitted under MBB's TIN on an out-of-network basis for non-MBB providers, and that were paid by Aetna without invocation of the NSA IDR process.

189. Aetna incorporates by reference as fully set forth herein the allegations in paragraphs 38-101 and 170-187.

190. The submission of a claim for reimbursement to Aetna constitutes a certification and representation that the information shown on the claim is true, accurate, and complete, and that the submitted claim did not knowingly or recklessly disregard or misrepresent or conceal material facts.

191. Each time MBB and Radiology Partners submitted a claim they represented that MBB performed the services being billed and, thus, MBB was entitled to reimbursement for those services.

192.   Yet, most of the providers that MBB and Radiology Partners billed using MBB's TIN worked for medical groups other than MBB, rendering these representations false.

193.   Aetna relies on the TIN billed by providers to identify the medical group that performed the services and the rate at which claims are payable, if at all.

194.   Thus, these misrepresentations were material to Aetna's determination of whether the claims at issue billed by MBB were payable to MBB.

195.   MBB and Radiology Partners made these misrepresentations with the intent to wrongfully induce Aetna to pay MBB.

196.   Aetna reasonably relied on these misrepresentations by MBB and Radiology Partners and paid the claims. Because Aetna processes over one million claims per day, the vast majority are adjudicated by Aetna's claims processing systems, trusting that the information submitted on the claims is accurate. Due to the volume of claims that Aetna processes, Aetna cannot investigate the accuracy of each claim before making the decision to pay it, as doing so would grind the healthcare system to a halt.

197.   Instead, Aetna relied on MBB's and Radiology Partners' representations that the information on the claims was true, accurate, and complete, that MBB provided the services billed, and that MBB and Radiology Partners did not knowingly or recklessly disregard, misrepresent, or conceal material facts.

198.   MBB and Radiology Partners also acted under a regime of silence and misdirection to keep Aetna from discovering the truth about the scheme. Those extensive concealment efforts are described above.

199.   MBB and Radiology Partners also omitted material information from Aetna. For instance, and as detailed above, MBB and Radiology Partners concealed that MBB had been acquired by Radiology Partners, and that MBB was now billing for services provided by other medical groups owned by Radiology Partners.

200.   Because of its reliance on these misrepresentations, and the omissions that Defendants knowingly made, Aetna was damaged.

201.   Thus, Aetna is entitled to an award of damages in an amount to be proven at trial.

### COUNT TWO – NEGLIGENT MISREPRESENTATION
### (Against Radiology Partners and MBB)

202.   This cause of action is pleaded in the alternative to Count One.

203.   This cause of action applies with respect to benefit claims that were submitted under MBB's TIN on an out-of-network basis for non-MBB providers, and that were paid by Aetna without invocation of the NSA IDR process.

204.  Aetna incorporates by reference as fully set forth herein the allegations in paragraphs 38-101 and 170-187.

205.   The submission of a claim to Aetna constitutes a certification and representation that the information shown on the claim is true, accurate and

complete, and that the submitted claim did not knowingly or recklessly disregard or misrepresent or conceal material facts.

206.  Each time MBB and Radiology Partners submitted a claim they represented that the provider who performed the service was working under MBB, as opposed to another medical group.

207.  Likewise, each time MBB and Radiology Partners submitted a claim they represented that MBB performed the services being billed (as opposed to another medical group) and, thus, that MBB was entitled to reimbursements for those services.

208.  Yet, many of the providers that MBB and Radiology Partners billed under MBB's TIN were part of medical groups other than MBB. Thus, the billed services were performed by the other medical groups and not by MBB.

209.  These representations were material to Aetna's determination of the rate at which the claims would be payable and whether claims submitted and billed by MBB were payable to MBB.

210.  MBB and Radiology Partners made the aforementioned misrepresentations and omissions with the intent to wrongfully induce Aetna and its plan sponsors to make payment on the claims to MBB.

211.  MBB and Radiology Partners also acted under a regime of concealment and misdirection to keep Aetna from discovering the truth about the massive pass-through billing scheme that they were implementing. As described

above, they concealed that MBB had been acquired by Radiology Partners and that MBB was now billing for medical services rendered by other medical groups.

212.  Those representations were false, and Radiology Partners and MBB either knew the representations were false, made them without knowledge of their truth or falsity, or made them under circumstances in which Radiology Partners and MBB ought to have known of their falsity.

213.  Radiology Partners and MBB intended or expected that Aetna and its plan sponsors would rely on its misrepresentation in paying claims and/or continuing its relationship with MBB.

214.  Aetna justifiably relied on Radiology Partners' and MBB's misrepresentations and was damaged as a result by making payments on the claims that were submitted.

215.  Radiology Partners and MBB had superior and special knowledge of this scheme, including their relationship with each other and other Radiology Partners-controlled medical groups, and that MBB was submitting claims for medical services rendered by these other medical groups.

216.  Radiology Partners and MBB had a duty to disclose to Aetna information material to the claims MBB was submitting for reimbursement.

217.  Radiology Partners and MBB understood that, under the circumstances, Radiology Partners and MBB had a special relationship of trust and confidence toward Aetna that gave rise to a duty to speak and disclose material

information regarding the claims being submitted, and Aetna understood based on the existence of that duty that material information would be disclosed to it.

218.    By virtue of the foregoing, Aetna is entitled to an award of damages in an amount to be proven at trial.

## COUNT THREE – CIVIL CONSPIRACY
### (Against Radiology Partners and MBB)

219.    This cause of action applies with respect to benefit claims that were submitted under MBB's TIN on an out-of-network basis for non-MBB providers, and that were paid by Aetna without invocation of the NSA IDR process.

220.    Aetna incorporates by reference as fully set forth herein the allegations in paragraphs 38-101 and 170-187.

221.    Radiology Partners, MBB, other medical groups acquired by Radiology Partners, and private-equity firms funding Radiology Partners (including NEA, SIH, and others) conspired together to unlawfully, fraudulently, and deceitfully procure funds from Aetna through the billing scheme described herein.

222.    Each of the co-conspirators played an integral role in carrying out this billing scheme:

    a. Private-equity firms such as NEA, SIH, and others armed Radiology Partners with hundreds of millions in funds so that it could acquire other medical groups, achieve market dominance, and play shell games with claims.

b. Radiology Partners acquired medical groups across Florida and thereafter controlled how the claims for services performed by providers affiliated with those medical groups would be billed, including funneling all such claims under MBB's TIN.

c. MBB submitted the claims for reimbursement to Aetna, and received reimbursements to which it was not entitled.

d. The other medical groups controlled and owned by Radiology Partners in Florida allowed services provided by their physicians to be billed under MBB's TIN so that the scheme could realize increased volumes.

223. The concerted actions of Radiology Partners, MBB, other medical groups acquired by Radiology Partners, and private-equity firms have caused Aetna to be damaged in an amount to be determined at trial.

224. Alternatively, even if the actions taken by Radiology Partners, MBB, other medical groups acquired by Radiology Partners, and the aforementioned private equity firms do not constitute any separately actionable tort or other wrong, the actions still constitute an unlawful conspiracy. Acting together, these entities possess a "peculiar power of coercion," including over Aetna, by virtue of their combination, relationship, and economic influence. *See Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) ("[A]n alternative basis for a civil conspiracy claim exists where the plaintiff can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which

an individual acting alone does not possess.'" (internal citations omitted)).

225.  Radiology Partners, MBB, other medical groups acquired by
Radiology Partners, and the aforementioned private equity firms acted
maliciously in conspiring to concoct this billing scheme to extract higher
reimbursement from Aetna and its plan sponsors.

226.  This concerted action has caused Aetna to be damaged by paying
claims that were fraudulent and the product of unlawful, unfair, and deceptive
practices.

227.  By virtue of the foregoing, Aetna is entitled to an award of damages in
an amount to be proven at trial.

## COUNT FOUR – UNJUST ENRICHMENT
### (Against Radiology Partners and MBB)

228.  This cause of action applies with respect to benefit claims that were
submitted under MBB's TIN on an out-of-network basis for non-MBB providers,
and that were paid by Aetna without invocation of the NSA IDR process.

229.  Aetna incorporates by reference as fully set forth herein the
allegations in paragraphs 38-101 and 170-187.

230.  MBB and Radiology Partners are liable under the principle of unjust
enrichment.

231.  MBB and Radiology Partners used wrongful conduct to obtain a
benefit to which they are not entitled.

232.  MBB and Radiology Partners submitted claims and/or caused claims

to be submitted to Aetna that it would not have paid to MBB but for the wrongful conduct of MBB and Radiology Partners as described herein.

233.  Aetna paid claims to MBB, and some of those funds were then funneled to Radiology Partners.

234.  When Aetna paid MBB for services it was not obligated to cover, MBB and Radiology Partners received a benefit from Aetna.

235.  As a result, MBB and Radiology Partners have been unjustly enriched and Aetna, its plan sponsors, and their member employees have been injured.

236.  It would be inequitable for MBB and Radiology Partners to retain amounts Aetna paid because of MBB's and Radiology Partners' wrongful conduct.

237.  Aetna lacks an adequate remedy at law for the injuries inflicted by Radiology Partners and MBB, and accordingly seeks the return of that money in equity to compensate Aetna and its plan sponsors.

### COUNT FIVE – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Against Radiology Partners and MBB)

238.  This cause of action applies with respect to benefit claims that were submitted under MBB's TIN on an out-of-network basis for non-MBB providers, and that were paid by Aetna without invocation of the NSA IDR process.

239.  Aetna incorporates by reference as fully set forth herein the allegations in paragraphs 38-101 and 170-187.

240.  MBB and Radiology Partners are, and have been, engaged in trade and commerce in the State of Florida.

241.    MBB and Radiology Partners have sought to specifically harm Florida consumers in the execution of their deceptive and fraudulent scheme.

242.    Aetna, its plan sponsors, and its members are consumers under FDUTPA. *See* Fla. Stat. § 501.203(7).

243.    Aetna has been injured by MBB and Radiology Partners' unfair or deceptive practices in the course of buying and paying for medical services that MBB and Radiology Partners rendered unlawfully and sold in the State of Florida.

244.    MBB and Radiology Partners' business practices constitute both *per se* and traditional violations of FDUTPA.

245.    MBB and Radiology Partners' acts and practices constitute *per se* FDUTPA violations because they violate statutes that proscribe unfair methods of competition and unfair, deceptive, or unconscionable acts or practices, including Fla. Stat. § 817.234 (prohibiting false and fraudulent insurance claims).

246.    MBB and Radiology Partners' unlawful acts and practices affected many claims for services rendered in Florida and have caused significant economic harm to Aetna, its customers, and its members because MBB and Radiology Partners caused Aetna to make substantial payments, to the benefit of MBB and Radiology Partners, that Aetna was not obligated to make.

247.    MBB and Radiology Partners' acts and practices also constitute traditional violations of FDUTPA.

248.    MBB and Radiology Partners' unfair trade practices and deceptive acts that comprised their inappropriate billing scheme, by billing Aetna for services

provided by other medical groups, misled Aetna and caused Aetna to make substantial payments to MBB and Radiology Partners that were not owed and would not have been paid but for MBB and Radiology Partners' conduct.

249.    Aetna seeks damages for benefits paid on the unlawful and deceptive claims MBB and Radiology Partners submitted, or caused to be submitted, to Aetna, plus attorney's fees, costs, and interest; a declaratory judgment declaring MBB and Radiology Partners' acts and practices unfair and deceptive and in violation of FDUTPA; an order enjoining MBB and Radiology Partners from continuing to engage in such unfair and deceptive acts and practices; and any other relief the Court deems just and proper.

250.    By virtue of the foregoing, Aetna is entitled to an award of damages in an amount to be proven at trial.

### COUNT SIX – VACATION OF NSA IDR
### AWARDS UNDER 9 U.S.C. § 10
### (Against MBB)

251.    This cause of action applies with respect to benefit claims that were submitted to the NSA IDR process for non-MBB providers.

252.    Aetna incorporates by reference as fully set forth herein the allegations in paragraphs 38-187.

253.    The NSA allows a district court to vacate an IDR award in the following four circumstances:

     a.    where the award was procured by corruption, fraud, or undue means;

b.  where there was evident partiality or corruption in the arbitrators, or either of them;

c.  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

d.  where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42 U.S.C. § 300gg–111 (c)(5)(E)(1) (adopting standards found at 9 U.S.C. § 10(a)).

254.  "A determination of a certified IDR entity . . . shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." 42 U.S.C. § 300gg-111(E)(i)(1).

255.  Since Aetna's termination of the participation agreement with MBB, MBB has improperly initiated and received IDR awards, including without limitation those listed in **Exhibit A** attached hereto.

256.  In doing so, MBB falsely attested to the Department of Health & Human Services ("HHS"), the IDREs, and Aetna that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process." Upon information and belief, HHS and the IDREs rely on this attestation to determine that a submitted dispute is subject to the NSA IDR process.

257.  These awards were each "procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1).

258.   By initiating these NSA IDRs, MBB represented that the claims were properly payable to MBB and/or were for medical services rendered by a "nonparticipating provider or a nonparticipating facility." *Id.* § 300gg-111(c)(1)(A).

259.   However, in reality, these claims were rendered by "participating provider[s]" because the physician that actually provided the services at issue had a "contractual relationship" with Aetna "with respect to the furnishing of such an item or service at such facility." *Id.* § 300gg-111(a)(3)(E)(v)(G)(ii). Thus, these claims were never subject to the NSA.

260.   Because of the covert nature of the scheme, the false attestations, MBB's practice of submitting thousands of IDR disputes to HHS at once (thus overwhelming Aetna's ability to investigate individual claims before the statutory deadline to respond), and other acts and omissions taken by Defendants described above, neither Aetna nor the IDREs could have discovered the fraud prior to or during the IDR process.

261.   Upon information and belief, MBB also submitted materials and briefs to the IDREs that were inflated and contained misrepresentations based on the first phase of the billing scheme described herein. This allowed MBB to win a vast majority of the NSA IDR awards and at high reimbursement-rate levels. This fraud was not reasonably discoverable by Aetna, or the IDR arbitrators, including for example because the submissions of the parties in the NSA IDR process are not available to one another.

262.    The unlawfully obtained awards, including those in **Exhibit A,** also amount to the IDREs "exceed[ing] their powers[.]" 9 U.S.C. § 10(a)(2).

263.    Specifically, the NSA only provides IDR jurisdiction over disputes submitted by a "nonparticipating provider or a nonparticipating facility." But all of the ineligible claims were submitted by "participating provider[s]." Thus, the arbitrators lacked statutory authority to render these awards.

264.    The IDREs reasonably relied upon MBB's misrepresentations, including but not limited to the false attestation that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process." This induced the IDR arbitrators to "exceed their powers" and render awards on claims for reimbursement not subject to the NSA in the first instance.

265.    Because of the efforts of Radiology Partners and MBB to hide their fraudulent scheme from Aetna, Aetna was unaware that Defendants were filing fraudulent NSA IDRs on behalf of MBB. In late 2024, Aetna grew suspicious, investigated, and promptly filed this action. In all respects, Aetna acted with reasonable diligence to promptly seek vacatur of the IDR awards.

266.    In sum, the IDR awards procured by MBB's "corruption, fraud, and undue means" run contrary to the purpose of the NSA and have driven the costs of healthcare up for all, without any justification. Likewise, due to MBB's misrepresentations, the arbitrators rendering these awards "exceeded their powers" by issuing decisions on claims for services actually rendered by "participating provider[s]." Thus, the awards should be vacated.

## <u>COUNT SEVEN – DECLARATORY AND INJUNCTIVE RELIEF UNDER ERISA § 502(a)(3) AND 28 U.S.C. §§ 2201 AND 2202</u>

### (Against Radiology Partners and MBB)

267.  Aetna incorporates by reference as fully set forth herein the allegations in paragraphs 28-101 and 170-187.

268.  Aetna provides claims administration services for certain health benefit plans governed by ERISA.

269.  The administrative services agreements between Aetna and its plan sponsors detail the rights and obligations of Aetna and the plan sponsors.

270.  The administrative services agreements and/or plan documents delegates to Aetna limited discretionary authority to interpret the benefit plans and determine claims for benefits.

271.  The administrative services agreements and/or plan documents also give Aetna limited discretion and authority to monitor and pursue overpayment of funds from the benefit plans, including overpayments resulting from fraud, waste, or abuse through litigation.[12]

272.  Thus, Aetna has standing under ERISA § 502(a)(3) and 29 U.S.C. § 1132(a)(3) to seek declaratory and injunctive relief to enjoin any acts or practices that violate the provisions of the benefit plans and to obtain other appropriate relief to redress violations of and enforce benefit plan terms.

---

[12] Aetna will identify the specific members, claims, and plans at issue following the entry of a HIPAA-qualified protective order.

273.    Although the terms of the benefit plans vary to some extent, the following plan terms are reasonably representative:

    a.    "If a benefit payment is made by the Plan, to or on [the member's] behalf, which exceeds the benefit amount that [the member is] entitled to receive, the Plan has the right to require the return of the overpayment."

    b.    Exclusions from coverage for "[s]ervices [the member] has no obligation to pay."

    c.    In the event of fraud or intentional misrepresentation of material facts, Aetna may rescind coverage, deny benefits, and/or recover amounts already paid.

274.    Through the acts described herein, Radiology Partners and MBB caused the overpayment of funds on behalf of ERISA-governed benefit plans in violation of the benefit plans' terms and such benefit plans authorize Aetna to seek to recover such overpayments and to halt Defendants' continuing efforts to defraud and otherwise obtain overpayments from such benefit plans.

275.    Radiology Partners and MBB are continuing to engage in their fraudulent and tortious acts presently, including continuing to submit claims using MBB's TIN for non-MBB providers in an effort to procure overpayments and, in turn, use such overpayments to coerce a more lucrative in-network contract for MBB and Radiology Partners' others Florida-based medical groups.

276.    There is an actual case and controversy between Aetna (on the one hand), and Radiology Partners and MBB (on the other hand) relating to the claims improperly submitted under MBB's TIN.

277.    Accordingly, Aetna seeks an Order:

    a.    Enjoining Radiology Partners and MBB from billing for non-MBB providers using MBB's TIN; and

    b.    Enjoining Radiology Partners and MBB from transferring or dissipating funds paid by Aetna on behalf of the ERISA plans.

278.    There is no other remedy available at law to prevent the irreparable harm that will result as to Aetna and the ERISA-governed benefit plans if Defendants are permitted to continue engaging in the conduct described herein.

279.    There is also a present need for a declaration as to the unlawfulness of the Defendants' conduct and with respect to their ongoing relationship.

280.    Accordingly, Aetna further seeks an Order declaring that:

    a.    The claims billed by Defendants for non-MBB providers using MBB's TIN are not covered services under the ERISA benefit plans;

    b.    Radiology Partners and MBB received overpayments from the ERISA benefit plans for services rendered by non-MBB providers that were billed using MBB's TIN; and

    c.    Claims billed using MBB's TIN for non-MBB providers are not payable or owing under the ERISA-governed benefit plans on a go-forward basis.

## COUNT EIGHT – DECLARATORY JUDGMENT
## UNDER 28 U.S.C. § 2201

### (Against Radiology Partners and MBB)

281.   Aetna incorporates by reference as fully set forth herein the allegations in paragraphs 38-101 and 170-187.

282.   There is an actual, substantial, and present controversy between Aetna, on the one hand, and Radiology Partners and MBB, on the other hand, concerning the propriety of and amounts owed (if any) on the claims billed by Defendants using MBB's TIN for services rendered by non-MBB providers.

283.   Radiology Partners and MBB are continuing to submit claims using MBB's TIN for non-MBB providers.

284.   There is a controversy as to Aetna's obligation to pay for services billed using MBB's TIN on an out-of-network basis that were rendered by non-MBB providers, both retroactively and prospectively.

285.   Aetna, Radiology Partners, and MBB have adverse legal interests. Radiology Partners and MBB contend they are entitled to payment from Aetna for services rendered by the non-MBB physicians, even when such services were or are billed to Aetna using MBB's TIN.

286.   Thus, Aetna seeks a judgment declaring that Aetna is not obligated to pay for services billed using MBB's TIN that were rendered by non-MBB providers.

## **JURY DEMAND**

Aetna requests a jury trial as to all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Aetna respectfully requests an award in its favor granting the following relief:

a.    An award of compensatory damages as requested herein;

b.    An award of punitive and exemplary damages;

c.    Equitable and declaratory relief as requested herein;

d.    Costs;

e.    Reasonable attorney fees;

f.    Prejudgment and post-judgment interest; and

g.    An award of any other relief in law or equity that the Court deems just and proper.

Dated: October 3, 2025                    By: _/s/ Jared J. Burns_

                                        **ROBINS KAPLAN LLP**

Jared J. Burns
Fla. Bar #1003415
JBurns@robinskaplan.com
10151 Deerwood Park Blvd.,
Building 200, Suite 250
Jacksonville, FL 32256
P: (612) 349-8500

Nathaniel J. Moore*
NMoore@robinskaplan.com
Marcus A Guith*
MGuith@robinskaplan.com
Kyle D. Nelson*
KNelson@robinskaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
P: 612.349.8500

Paul D. Weller*
PWeller@robinskaplan.com
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
P: 212.980.7400

_Attorneys for Plaintiffs Aetna Health Inc., Aetna Life Insurance Company, and Aetna Health Insurance Company_

*Admitted _pro hac vice_